NATIONAL EDUCATION ASSOCIATION, Inc., a non-profit corporation chartered by the Congress of the United States, and the Florida Education Association, Inc., a non-profit corporation chartered under the Laws of the State of Florida, and George Williams, Margaret W. Heppe, Dorothy L. Hutchins, Etha May Oberlin, Patricia Ann Roguszka, Damon Selmore, Vincent L. Tata, Paul A. Acquisto and George H. Steele, individually and on behalf of all other persons similarly situated, Plaintiffs,

v.

LEE COUNTY BOARD OF PUBLIC INSTRUCTION and Gilbert Moore, Franklin C. Lott, Robert W. Anderson, Sidney Parnell and Morton Goldberg, individually and as members of the Lee County Board of Public Instruction, and Ray L. Williams, individually and as Superintendent of the Lee County public school system, Defendants.

Civ. No. 68–15.

United States District Court
M. D. Florida,
Ft. Myers Division.

May 13, 1969.

Richard H. Frank, Frank & Grandoff, Tampa, Fla., Robert H. Chanin, Washington, D. C., Hershel Shanks, Allan I. Mendelsohn, Robert M. Perce, Jr., Glassie, Pewett, Beebe & Shanks, Washington, D. C., for plaintiffs.

Emmet B. Anderson, Anderson & Blair, Ft. Myers, Fla., Granville M. Alley, Jr., Tampa, Fla., for defendants.

## OPINION

KRENTZMAN, District Judge.

This suit contests the legality of certain $100 fines paid by approximately 400 public school teachers in Lee County, Florida, following the educational crisis that gripped the entire state in February and March, 1968. The suit has been brought as a class action under Rule 23, F.R.Civ.P.[1]

[1]. On September 30, 1968, the Court ruled, pursuant to Rule 23(c)(1), that the plaintiffs are entitled to maintain the case as a class action under Rule 23(b)(1) and 23(b)(2).

There are three categories of plaintiffs. The first category, of whom seven are named as plaintiffs, is made up of teachers who actually paid the $100 fines. These teachers seek to recover the fines they paid on the ground that they constitute illegal exactions. There are approximately 400 Lee County teachers in this category. The second category of plaintiffs, of whom two are named plaintiffs, consists of teachers who refused to pay the fine and who were therefore denied permission to return to the classroom after the crisis. These teachers seek a judgment for lost wages and for reinstatement to their former positions. The total number of teachers in this category has not yet been determined. Finally, two teacher organizations have also joined as plaintiffs in this action. They are the National Education Association and the Florida Education Association.

The defendants are the Lee County Board of Public Instruction, the individual members thereof, and the Lee County Superintendent of Schools.

The case is now before the Court on cross-motions for summary judgment filed by all parties. The background facts and the major evidentiary facts regarding the contested payments are not in dispute. Certain details are in dispute and, as to these, the question is whether or not they are material. The Court finds that they are not material and that even assuming the accuracy of defendants' version, plaintiffs' motion for summary judgment must be granted.

This dispute grew out of the public school crisis which threatened to close Florida's schools in February and March, 1968. In February, 1968, Governor Kirk convened an extraordinary session of the Florida legislature. This session was necessitated by the fact that he had vetoed the educational appropriations act passed by the regular session and the legislature had adjourned without passing a substitute education bill. On Feb-

ruary 16, 1968, the extraordinary session passed a new education bill and promptly adjourned. The Governor threatened to veto this bill as well. As a consequence, thousands of teachers in Lee County prepared over the weekend of February 17–18, 1968, to submit already signed resignations, thus presaging a work stoppage on Monday, February 19.

On Monday morning, the Lee County teachers who had signed resignations did not report for work. The Lee County School Board promptly filed an injunction suit against the teachers in the appropriate state court, based on F.S.A. § 839.221 which prohibits strikes by governmental employees.

At a meeting of the School Board held on Tuesday morning, February 20, 1968, an attempt was made to present to the School Board the resignations which the teachers had signed. According to the official minutes of the School Board, however, "the box of papers (containing the resignations) was ignored."

On Wednesday, February 21, 1968, 441 Lee County teachers and principals personally presented their resignations at the Office of the Superintendent of Schools. Later that day, the Twelfth Judicial Circuit Court in Lee County issued a temporary restraining order enjoining the teachers from striking. The order added that "Nothing in this Order, however, shall effect or prevent a Defendant from effecting a lawful resignation." Though over 400 teachers remained away from the classroom, no contempt proceedings were brought to determine whether or not the teachers who had submitted their resignations were in violation of the restraining order.[2]

At a meeting on February 28, the teachers still not having returned to the classroom, the Board voted to accept all unrevoked resignations as of 5:00 p. m., March 1, 1968. At 5:00 p. m. on that date, 425 teachers had submitted unrevoked resignations and their resignations were accordingly accepted.

The matter continued in this posture until March 8, 1968. At this time it became clear that the Governor was not going to carry out his threat to veto the legislation passed by the extraordinary session of the Legislature, but was instead going to permit it to become law without his signature. The Florida Education Association promptly announced that, having accomplished all that could be done at that time, the teachers should return to the classroom, provided that there were no reprisals and that they were not reduced in status.

The foregoing facts, although undisputed, are relevant only as background. The significant fact is that, for whatever reason, as of March 8, 1968, the resigned teachers and principals of Lee County were prepared to return to the classroom at their status prior to the work stoppage. Several prominant, public-spirited citizens offered to mediate between the School Board and the teachers in order to provide some means of communication between the opposing sides. By March 15 a proposal to get the teachers back into the classroom had been worked out under the auspices of these private citizens. The proposal on that date was presented to a meeting of the resigned teachers and to the School Board, and a majority of both groups voted in favor of the proposal.

One of the provisions of the proposal, Paragraph 5, stated that all teachers "would be reemployed on the same basis as if his resignation had never been submitted or received by the Lee County School Board, provided that any such teachers shall forfeit a fine of $100.00." Approximately 400 teachers paid the $100 fine and returned to the classrooms. Others, like plaintiffs Acquisto and Steele, refused to pay the fine and were not permitted to return.

Plaintiffs contend that the imposition of this "fine" as a condition to accepting

---

2. The restraining order never ripened into a permanent injunction and its only relevance here is as background.

the teachers' return to employment violated the right to due process of law which is guaranteed to them by the Fourteenth Amendment to the United States Constitution. They also claim rights under state law, as to which they invoke this Court's pendent jurisdiction to dispose of state law questions presented by the identical facts on which a substantial federal question is based. Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933); United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The defendants deny that there has been a violation of either federal or state law.

## I

The matters that divided the School Board and the teachers after March 8 (when the citizens began their attempt to mediate a settlement) clearly emerge from the affidavits regarding the negotiations and from other documentary evidence in the record. The teachers were willing to return to their old status. The Board also wanted the teachers back, but only in the status of new teachers, with the attendant reduction in salary and loss of tenure and other benefits that this status would entail.

Defendants concede that on March 8 the teachers had effectively resigned and accordingly were legally free to refuse to return to the classroom. The first proposal which was put forward by the citizens who were conducting the negotiations provided that the resigned teachers "shall be employed on the same basis as a new teacher. Any teacher so employed will be entitled to reemployment beginning with the school year 1968–69 on the same pay, benefit and tenure basis as if his resignation had never been submitted or received by the Lee County School Board." In other words, this early proposal suggested that the resigned teachers would be reinstated as new teachers for the remainder of the 1967–1968 school year and that those of them who were allowed to come back for the 1968–1969 school year would be restored to their former status. At a meeting of the teachers on March 14, 1968, they made it clear that this proposal, which would change their contractual status to that of new teachers for the remainder of the year, would not be acceptable.

According to the defendants' affidavits, the citizen mediators, Judge Archie M. Odom and Attorney John W. Shepherd suggested that the teachers be taken back in their status prior to the resignations, but that each teacher make a $100 payment to the Board. However, —still according to defendants' affidavits—the small group of teachers with whom the citizens were negotiating wanted the $100 payment to be denominated as a fine. Although the plaintiffs contest this version of the facts, they accept it for purposes of their motion for summary judgment, and the Court will also.

On the following day, March 15, a proposal providing that resigned teachers would be permitted to return at their prior status provided each forfeit a $100 fine was presented to a meeting of the resigned teachers and to a meeting of the School Board. The teachers met first and voted to accept the proposal, although some teachers voted against it because they felt that they had done nothing wrong and should not be required to pay a fine. At the School Board meeting, the Board was advised that the teachers had accepted the proposal. The Superintendent of Schools recommended that the paragraph relating to the fine be deleted and that the original proposal, by which the teachers would return as new teachers for the remainder of the year, be substituted in its place. The Chairman of the School Board asked one of the teacher leaders who was present what he thought the teachers would think of the change. The teacher leader then replied that the teachers had voted on the proposal as a whole and that if the Board changed the proposal, it would have to be resubmitted to the teachers.

The Board then accepted the proposal as submitted.[3]

The plaintiffs contend that a fine imposed for an unspecified wrong, without legislative authority, without a legislatively specified penalty and without any form of process violates the Due Process Clause of the Fourteenth Amendment, and that this constitutional violation is equally clear whether the unconstitutional fine is imposed directly or is made a condition of permitting the teachers to return at their old status. Defendants contend that the payment is not a fine; that if it was, the School Board has authority to impose a reasonable fine; and that in any event the teachers are legally foreclosed from objecting to the fine because they agreed to its payment at their meeting of March 15th.

## II

■ The Court has no difficulty in finding that the $100 payment was a fine. It was denominated a fine in the proposal itself. The payment was presented to and voted on by both the teachers and the School Board as a fine. The School Board minutes frequently refer to the payment as a fine, and even the newspapers refer to it in this manner. Moreover, the negotiations themselves give rise to the necessary implication that the payment was a fine. The teachers were willing to return to the classroom at their previous status. The School Board obviously believed the teachers were guilty of wrongdoing. The School Board wanted the teachers to return, but it also wanted to punish them, to retaliate for what the School Board believed to be the teachers' wrongdoing. That this was the issue in the minds of all is poignantly reflected in the minutes of a School Board meeting at which various principals who had not participated in the work stoppage gave their views regarding the basis on which the teachers should be permitted to return to work:

In answer to Mr. Parnell (a School Board member), Mr. Bieber (a principal) recommended accepting the teachers back without reprisal, on the contract basis they had when they left.

\* \* \* \* \* \*

Mr. Needles, Director of Secondary Education \* \* \* said he does not believe penalizing the teachers will do the school system any good.

\* \* \* \* \* \*

Mr. Goldberg (another School Board member) questioned how we should accept them (the teachers) back, to which Mr. Horton (another principal) replied with a spirit of forgiveness, if possible. Also, he would ask that they be brought back on the status that they left.

Defendants argue that the $100 payments were made by the teachers as part of a bargain to obtain their old status back, when legally all they were entitled to was the status of new teachers. There is nothing in the record to support this contention, and appears to be an after the fact attempt to find some justification for the $100 payment. The form in which the payment was presented to both sides and the basis on which the individual teachers submitted to it show clearly that it was a fine, not a payment for benefits received.[4]

Defendants next contend that if the $100 payments were fines, the general authority delegated to the School Board by F.S.A. § 230.22(1) and (2) permits the imposition of these fines.[5]

---

3. The Board did add one additional paragraph to the proposal as submitted relating to the withdrawal of so-called sanctions, which, however, is irrelevant for the present purpose.

4. Moreover, even if the $100 payments were payments for benefits received, they could not be sustained under state law. See, *infra*, note 10.

5. F.S.A. § 230.22(1) and (2) provide as follows:

230.22 General powers of county board.—The county board, after considering recommendations submitted by the county superintendent, shall exercise the following general powers:

(1) DETERMINE POLICIES.—The county board shall determine and adopt

The authority of governmental agencies in Florida is generally very narrowly construed. See Mahon v. City of Sarasota, 177 So.2d 665 (Fla.1965); Pridgen v. Sweat, 125 Fla. 598, 170 So. 653 (1936); Harvey v. Board of Public Instruction, 101 Fla. 273, 133 So. 868 (1931). This principle of narrow construction is particularly applicable to the question of whether a governmental agency has authority to impose a fine, a function normally confined to courts. Thus in Atlantic Coastline Railroad Co. v. State, 73 Fla. 609, 74 So. 595 (1917), the Supreme Court of Florida ruled that the Railroad Commission did not have authority to fine a railroad for disobeying an order to erect a station, even though the statute authorized the Commission to impose fines for violation of its "rate schedules, rules or regulations." [6]

■ The new Florida Constitution (Article I, Section 18) which went into effect January 1, 1969, F.S.A., provides that "No administrative agency shall impose a sentence of imprisonment, nor shall it impose any other penalty except as provided by law." Although this constitutional provision was not applicable at the time the fine involved here was imposed, this provision can only be interpreted as a constitutional codification of existing Florida case law. It is significant that the clause was suggested and drafted by Mr. Justice Roberts of the Florida Supreme Court who wrote the opinion in Mahon v. City of Sarasota, *supra*. See: Debate of Constitution Revision Commission, Tallahassee, Florida, 1062–1068 (December, 1966).

■ For these reasons, it is clear that under Florida law a grant of general authority to School Boards, which permits them to adopt rules, regulations and general policies to further the efficient operation of the schools, does not permit them to impose fines.

■ In light of the foregoing authority, this Court also concludes that a Florida School Board does not have authority to sell to the teachers the benefit of their prior status in exchange for a $100 payment. Cf. Harvey v. Board of Public Instruction, 101 Fla. 273, 133 So. 868 (1931). Florida statutes provide the conditions upon which teachers are to obtain certain benefits as a result of satisfactory prior performance. These benefits may not be sold for a $100 payment. In this case the teachers were returned to their prior status by the retroactive revocation of the School Board's acceptance of the teachers' resignations (see School Board Minutes of March 15, 1968). The Court does not believe that Florida law authorizes the Board to accept a $100 payment as an inducement to take this action. Accordingly, whether the $100 payment is considered a fine or a payment to the Board to induce it to rescind the resignations retroactively, it is unauthorized under Florida law.

## IV

That the fine was imposed without legislative authorization is only one as-

---

such policies as are deemed necessary by it for the efficient operation and general improvement of the county school system. In arriving at a determination of policies affecting certificated personnel, the county board may appoint or recognize existing committees composed of members of the teaching profession, as defined in the professional teaching practices act, sections 231, 54, 231.55, 231.57–231.59. When such committees are involved in the consideration of policies for resolving problems or reaching agreements affecting certificated personnel the committee membership shall include certificated personnel representing all work levels of instruction-

al and administrative personnel as defined in the school code.

(2) ADOPT RULES AND REGULATIONS.—The county board shall adopt such rules and regulations to supplement those prescribed by the state board as in its opinion will contribute to the more orderly and efficient operation of the county school system.

6. The reasoning of this case is especially applicable here, because Florida has provided specific sanctions for a variety of teacher misconduct, including any conduct of which the teachers here are even arguably guilty. See F.S.A. § 231.36(1), (2), (4) and (6); § 231.44 and § 839.-221.

pect of its invalidity. In addition, it was imposed for an unspecified wrong and without any process or procedure for determining guilt or innocence in each individual case.

There is no doubt in this Court's mind that punishment so imposed does not comport with the requirements of due process of law. It would be difficult to imagine a more arbitrary action of government than the *ad hoc* imposition of a penalty for a wrong which had not been previously defined either by the imposing authority or by the legislature, for which there was no legislatively specified penalty and which was imposed without any process or procedure. Cf. Bouie v. Columbia, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964); In re Ruffalo, 390 U.S. 544, 551, 88 S.Ct. 1222, 20 L.Ed. 2d 117 (1968). It would seem obvious that under our system of government a man may not be punished except for a wrong which the legislature has previously defined, and only then with a punishment which the legislature has previously specified, and after his guilt or innocence has been determined by fair procedure.

The Florida legislature has wisely established elaborate rules governing the activities of teachers. It has established varying penalties and sanctions for infraction of these rules. It has provided procedures by which to determine whether an infraction has occurred. These legislatively specified wrongs include participation in a strike,[7] immorality, misconduct in office, incompetence, gross insubordination, willful neglect of duty, conviction of a crime involving moral turpitude,[8] and willful absence from duty without leave.[9] The Lee County School Board chose not to follow any of these legislatively marked pathways. Instead it fixed a penalty of its own after the fact and without legislative authorization.

## V

■ While the Board did not impose the fine directly, it was made a condition to the teachers' returning to work. However, this indirection cannot save the exaction. What the government may not do directly, it may not do indirectly by making it a condition on the granting of a privilege. As the Supreme Court recently noted, "The theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected." Keyishian v. Board of Regents of State of New York, 385 U.S. 589, 605–606, 87 S.Ct. 675, 685, 17 L.Ed.2d 629 (1967). See also cases there cited. The Court in Keyishian rejected the contention that "Public Employment, including academic employment, may be conditioned upon the surrender of constitutional rights which could not be abridged by direct government action" (*id.* at 605, 87 S.Ct. at 685). As the Supreme Court stated in another context, "It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." Sherbert v. Verner, 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963).

■■ Thus the fact that the fine in this case was made a condition of the teachers' return, rather than having been imposed directly on each teacher who resigned, gives its imposition no constitutional grace.[10]

7. F.S.A. § 839.221

8. F.S.A. § 231.36

9. F.S.A. § 231.44

10. Whether there would be a constitutional violation if the $100 payments were regarded simply as unauthorized payments in exchange for the benefit of prior status need not be decided. Such payments would violate state law and would therefore constitute a wrong to plaintiffs on this ground as well. This Court has jurisdiction to grant relief on the basis of state law as well as federal law where the identical facts constitute a violation of both. Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933); United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16

## VI

Defendants urge in support of the imposition of the fines that they were suggested and agreed to by the teachers who in effect forced them upon the School Board. The contention that the fines were forced upon the School Board is clearly specious. The teachers obviously would have accepted a proposal which would have allowed them to return at their old status but without paying the fine. No one in his right mind insists upon paying a $100 fine when he may choose not to pay it without suffering any other disability. The statement in opposition to the fine made by certain individual defendants at the March 15 School Board meeting was based not on the desire to dispense with any punishment at all but on the desire to impose what they regarded as a more severe disability. To suggest, as the defendants here do, that the teachers somehow wanted and even insisted on fining themselves is to distort both logic and the facts.

■ If the teachers did not insist upon paying the fine, neither did they agree to pay the fine in any meaningful sense of that word. In the first place, the assent to the proposal expressed by a majority of the resigned teachers at their meeting on March 15, did not create any legal contract. There was no employer-employee relationship between the School Board and the teachers' group, the latter being simply an informal, *ad hoc* assembly of resigned teachers. This teachers group had no official legal status to represent the teachers. No written contract between the teachers group and the School Board was contemplated or signed. The teachers group was simply an instrument for communication with the individual teachers, with whom alone the Board had, and sought to have, a contractual relationship. It is of course true that there was a high likelihood that the individual teachers would do what the majority decided was in their best joint interests. Thus, as a practical matter, it was important for the School Board to know what the teachers group felt about a particular proposal. However, this created no jural relationships between the Board and the teachers; and the individual teacher was thereafter free to reject the proposal (as some did) or to attempt to obtain better conditions for himself. Some of the teachers voted against acceptance of the proposal, but when faced with the stark alternative of paying the fine and returning to work or of not returning to work at all, they accepted the proposal. Others, including two named plaintiffs here, rejected the proposal and were not permitted to return to work. Thus the teachers cannot be said to have agreed to the payment of the fine in any legally significant sense.

■ Nor does the Court find constitutional significance in the fact that the suggestion of the fine may have come from one of the teacher leaders. It was not the suggestion of the fine that was unconstitutional. It was the adoption of the fine by the School Board as a solution to its problem—the problem of getting the teachers back and still inflicting some form of punishment which the teachers would accept—which was unconstitutional. To so conclude, it is not necessary to accuse the School Board of bad faith or evil intent. Certainly emotions ran high during the crisis, and this Court can well sympathize with and applaud the efforts of all to get the teachers back in the classroom. But the School Board is still a governmental authority. It is bound, even in a crisis, by the Constitution. It is not free to accept, if acceptance it was, an unconstitutional measure as a way to get the teachers to return.

■ Whether the School Board's attitude toward the resigned teachers was justified or not is not for this Court to say. Neither is it for this Court to

L.Ed.2d 218 (1966). On the basis of this Court's so-called pendent jurisdiction, the Court also finds that the $100 fines violate not only the state's common law as set forth above, but also the Due Process Clause in the Florida Constitution, Article I, Section 12 of the constitution in force at the time the events giving rise to this lawsuit occurred.

decide whether the teachers had engaged in any improper or unlawful conduct prior to the negotiations which form the background of this lawsuit. It is enough to say, as defendants concede, that the teachers had effectively resigned and were legally free not to return to the classroom. Given this fact, the School Board was not free to condition that return on the payment of a fine.

An appropriate order will be entered.

### ORDER

At hearing on March 27, 1969, after consideration of the pleadings herein, the motions for summary judgment filed respectively by plaintiffs and defendants, memoranda and oral argument of counsel presented in support thereof, and being advised, the Court ruled:

That plaintiff's motion for summary judgment was granted and defendants' motion for summary judgment was denied. The Court indicated it would enter a memorandum opinion and schedule a further hearing at which time the nature and extent of plaintiffs' damages could be determined.

At hearing on May 6, 1969, without waiving their right to appeal the Court's previous ruling, defendants stipulated that in addition to named plaintiffs, Paul A. Acquisto and George H. Steele, three other teachers refused to pay the fine, were denied re-employment and did not return to employment. These three are Sarah Sharpe, Charlotte Sabie and Sara Booth. It was further stipulated that the damages due each respectively are as hereinafter set out.

In consideration thereof and being advised, it is,

### ORDERED and ADJUDGED:

1. Plaintiffs' motion for summary judgment should be and hereby is, granted.

2. Defendants' motion for summary judgment should be, and hereby is, denied.

3. Attached hereto is a list of teachers who paid the $100 fine. Defendants are ordered to deliver to counsel for the plaintiffs on or before May 31, 1969, a check for $100 drawn to the order of each teacher named in the attached list as having paid the fine.

4. The defendants are ordered to reinstate Paul A. Acquisto, George H. Steele, Sarah Sharpe, Charlotte Sabie and Sara Booth beginning with the 1969–1970 school year to the same or to substantially similar positions as those which they held prior to February 16, 1968, with the same status, same rate of pay, retirement rights, accrued sick leave and other fringe benefits as they would have had had they been continuously in such reinstated positions from March 18, 1968, until the time of such reinstatement.

5. The defendants shall pay respectively as damages the amounts hereinafter specified:

| | |
|---|---|
| Paul A. Acquisto | $2,100.00 |
| George H. Steele | $5,200.00 |
| Sarah Sharpe | $2,225.00 |
| Charlotte Sabie | $1,950.00 |
| Sara Booth | $1,875.00 |

6. Defendants, their agents and employees, and each of them, are hereby enjoined from directly or indirectly threatening any teacher or principal or group with reprisals, retaliation or detriment for the reason that he or she has accepted the return of his or her $100 fine or for the reason that he or she has supported this litigation. Defendants, their employees and their agents, and each of them, are further enjoined from taking any reprisals or retaliatory action, such as reduction in status, withdrawal of privileges, or refusal to renew a contract, for the reason that the teacher or principal accepted the return of his or her $100 fine or supported this litigation.