Argued and submitted June 25, 1980,
affirmed as modified March 4, 1981

DAVID J. STERLING et al,
*Respondents,*
*v.*
CUPP et al,
*Petitioners,*
*and*
DERR et al,
*Intervenor-Petitioners.*

(TC 108452, CA 13246, SC 26907, SC 26915)

625 P2d 123

Scott McAlister, Assistant Attorney General, Salem, argued the cause for petitioners. With him on the brief were James A. Redden, Attorney General, Walter L. Barrie, Solicitor General, and Barbara A. Brainard, Certified Law Student.

Terry A. Pressler, Salem, argued the cause and filed a brief for intervenor-petitioners.

Jossi Davidson, Silverton, argued the cause and filed a brief for respondents.

LINDE, J.

**LINDE, J.**

Plaintiffs, who are male inmates of the Oregon State Penitentiary, sued to enjoin Superintendent Cupp and other prison officials from assigning female guards to duties which involve frisking male prisoners or observation of prisoners in showers or toilets, or for such other relief as the court deemed proper. After allowing a number of female corrections officers to intervene as parties defendant, the court enjoined defendants Cupp and Watson from "assigning female correctional officers to any position in which the job description or actual duties include frisks or pat-downs of male prisoners, except in emergency situations." On appeal, defendants contended respectively that no constitutional interest of plaintiffs was violated and that the order contravened the equal employment rights of female corrections officers. The Court of Appeals affirmed the order, 44 Or App 755 (1980), and we allowed review. With some textual modification, and subject to such further motion as defendants may make in the circuit court, we affirm the order.

For clarity, we refer to the parties as the prisoners, OSP, and the officers rather than by their respective positions as parties in this suit.

I. *The Constitutional Premises.*

■■ The prisoners' challenge to the legality of subjecting them to personally offensive touching or observation by guards of the opposite sex invoked a number of provisions of the Oregon as well as of the United States Constitution.[1]

---

[1] The complaint cited Or Const art I, §§ 10, 13, 16 and 20, and US Const amendments I, IV, V, VIII and XIV. The amended complaint omitted art I, § 10 and added art I, §§ 3, 15, 33 and added US Const amend IX, and omitted US Const amends IV and V.

This court repeatedly has stated that challenges to the validity of government action should neither take the form of "generalized constitutional attack without reference to specific textual provisions," *see Fifth Avenue Corp. v. Washington Co.,* 282 Or 591, 594 n.2, 581 P2d 50 (1978), nor merely cite a string of constitutional provisions without setting forth the text of each and analyzing its application to the contention at issue, *see Megdal v. Board of Dental Examiners,* 288 Or 293, 296, 605 P2d 273 (1980), *Rogers v. Department of Revenue,* 284 Or 409, 412 n.2, 587 P2d 91 (1978).

In this case, plaintiffs did at least cite relevant sections of the Oregon Constitution to the trial court, although they developed their argument under art I, § 13 only in response to this court's inquiry, perhaps because counsel commonly tend to search for sources in case law. *See* text at note 5.

The proper sequence is to analyze the state's law, including its constitutional law, before reaching a federal constitutional claim. This is required, not for the sake either of parochialism or of style, but because the state does not deny any right claimed under the federal Constitution when the claim before the court in fact is fully met by state law. *See, e.g., State ex rel Oregonian Pub. Co. v. Deiz,* 289 Or 277, 613 P2d 23 (1980); *State v. Spada,* 286 Or 305, 594 P2d 815 (1979), and *cf. State v. Tourtillott,* 289 Or 835, 618 P2d 423 (1980).[2] The Court of Appeals decided the case by reference to the prisoners' "constitutional right of privacy," 44 Or App at 757, explaining in a footnote that while "[t]he source of this right is not entirely clear," the court meant the phrase in its federal usage derived from *Griswold v. Connecticut,* 381 US 479, 85 S Ct 1678, 14 L Ed 2d 510 (1965). This premise drew a dissent from two members of the court.[3]

---

[2] Recent affirmations of the point are collected in *State v. Scharf,* 288 Or 451, 454-455, 605 P2d 690 (1980):

"Before addressing such federal issues, however, a court's responsibility is first to decide the effect of the state's own laws, because if the state provides what defendant claims, it does not deprive her of the due process commanded by the 14th amendment. Conversely, a procedure not forbidden by the United States Constitution is not by that fact 'authorized' in the absence of contrary state law, for the Constitution only limits the actions of state officials; authority to take these actions must be found in state law. *State v. Sims,* 287 Or 349, 353 n. 1, 599 P2d 461 (1979); *State v. Spada,* 286 Or 305, 309, 594 P2d 815 (1979); *State v. Smyth,* 286 Or 293, 593 P2d 1166 (1979); *State v. Scurlock,* 286 Or 277, 593 P2d 1159 (1979); *State v. Heintz,* 286 Or 239, 255, 257-258, 594 P2d 385 (1979) (concurring opinion); *State v. Greene,* 285 Or 337, 349, 591 P2d 1362 (1979) (concurring opinion); *State v. Flores,* 280 Or 273, 279, 570 P2d 965 (1977); *Brown v. Multnomah County Dist. Ct.,* 280 Or 95, 570 P2d 52 (1977); *State v. Ivory,* 278 Or 499, 503, 564 P2d 1039 (1977); *State v. Valdez,* 277 Or 621, 561 P2d 1006 (1977); *State v. Florance,* 270 Or 169, 180-187, 527 P2d 1202 (1974); *State v. Brown,* 262 Or 442, 453, 497 P2d 1191 (1972). If the state law is determined to be adverse to defendant, of course the federal issues remain to be decided. But the court will not needlessly interpret state law in a manner that would reach an unconstitutional result. *State v. Smyth, supra; State v. Harmon,* 225 Or 571, 577, 358 P2d 1048 (1961), and cases there cited."

[3]

"At the very least the parties ought to be furnished some explanation, any explanation, of the source and scope of the right of privacy the opinion would protect. It is understandable why the majority fails to do that, for aside from the *Griswold* case *[Griswold v. Connecticut,* 381 US 479, 85 S Ct 1678, 14 L Ed 2d 510 (1965)] (which is wholly beside the point here) and other vague *dicta* described in the opinion, no one has ever been able to furnish a principled constitutional explanation of the supposed right."

That the court found "privacy" a difficult premise for decision is not surprising. When a single term is stretched to reach from a civil claim against undesired disclosure or publicity, *see* Prosser, Law of Torts 802 (4th ed 1971); White, Tort Law in America 173-176 (1980), by way of a constitutional barrier against government intrusion into activities normally conducted in private, *see Griswold v. Connecticut, supra,* (marital use of contraceptives), and a privilege to engage at home in conduct forbidden elsewhere, *see Ravin v. State,* 537 P2d 494 (Alas 1975) (use of marijuana at home), *cf. Stanley v. Georgia,* 394 US 557, 89 S Ct 1243, 22 L Ed 2d 542 (1969) (possession of pornography at home), to claims of personal autonomy in choices of conduct, *see Roe v. Wade,* 410 US 113, 93 S Ct 705, 35 L Ed 2d 147 (1973) (abortion) and choices of domestic associations, *see City of Santa Barbara v. Adamson,* 27 Cal 3d 123, 610 P2d 436, 164 Cal Rptr 539 (1980) (residential "family" of unrelated individuals), the law is bound to pay a price in clarity and cogency. One may pause at the delegation to courts implicit in adopting such a protean and emotive term as a test of the validity of laws.[4] "A concept in danger of embracing everything is a concept in danger of conveying nothing." Tribe, American Constitutional Law 888-889 (1978). Thus the OSP officials argue that privacy is an

---

44 Or App at 762-763 (Joseph, J., dissenting, joined by Richardson, J.). Roberts, J., dissented on other grounds.

If the "right of privacy" lacks a "principled explanation," it is not for lack of attempts. *See, e.g., Carey v. Population Services International,* 431 US 678, 684-686, 97 S Ct 2010, 52 L Ed 2d 675 (1977); Tribe, American Constitutional Law 886-889 and sources there cited; *cf.* Kurland, *The Private I,* Univ Chi Mag 7 (1976), quoted in *Whalen v. Roe,* 429 US 589, 599 n.24, 97 S Ct 869, 51 L Ed 2d 64 (1977).

Inquiry into a distinctive meaning for "privacy," stimulated by *Griswold* and its sequels, has been similarly inconclusive among philosophers. *See, e.g.,* Thompson, *The Right to Privacy,* 4 Phil & Pub Aff 295 (1975) (concluding that no right in the "privacy cluster" is not covered by some other "cluster" of rights), and responses by Scanlon, 4 Phil & Pub Aff at 315, and Rachels, 4 Phil & Pub Aff at 323; Fried, *Privacy,* 77 Yale L Jnl 475 (1968) and Fried, *Privacy: Economics and Ethics, A Comment on Posner,* 12 Ga L Rev 423 (1978); Huff, *Thinking Clearly About Privacy,* 55 Wash L Rev 777 (1980). *See also* NOMOS XIII: *Privacy* (1971).

[4] The Alaska and California courts in the cited cases, unlike the United States Supreme Court, had to give meaning to "privacy" as an express term added to their respective state constitutions. Alas Const art I, § 22; Cal Const art I, § 1. *See also* La Const Art I, § 5 (1974); *Jaubert v. Crowley Post-Signal, Inc.,* ___ La ___, 375 S2d 1386, 1387, n. 2 (1979).

incongruous constitutional claim for prisoners in institutions whose very functions imply surveillance, while the prisoners invoke the concept of privacy in the sense in which bodily parts and functions are considered "private" in our and other cultures.

Though "privacy" in this sense may fit under that federal rubric even in prisons, there is no need to struggle with its difficulties here. They arise because contemporary claims of prisoners' rights, like many others, routinely have been taken to federal courts, so that the judicial opinions and the secondary commentary that counsel bring before state courts, as in this case, tend to repeat solely federal premises.[5] But the United States Constitution's concern with penal principles as such does not go beyond bills of attainder and "cruel and unusual punishments." US Const art I, §§ 9, 10, amend 8. Its restraints on state prison practices can be derived only from generally applicable constitutional guarantees, including due process and equal protection. US Const amend 14. State constitutions, by contrast, often contain clauses expressly directed toward guaranteeing humane treatment of those prosecuted for crime.

The Oregon Constitution long has included in its Bill of Rights, besides the prohibition of cruel and unusual punishments, no less than five such provisions that have no federal parallel. It undertakes to guarantee that punishment shall be designed for reformation and not "vindictive justice"[6] and shall not reach beyond the guilty individual,[7]

---

[5] See, e.g. Singer, Privacy, Autonomy, and Dignity in the Prison: A Preliminary Inquiry Concerning Constitutional Aspects of the Degradation Process in Our Prisons, 21 Buff L Rev 669 (1972); Comment, A Review of Prisoners' Rights Under the First, Fifth, and Eighth Amendments, 18 Duquesne L Rev 683 (1980). And see Capps/West v. Atiyeh, No. 80-6014 (D. Or, Aug. 22, 1980).

Not that a federal court is precluded from considering state law before reaching the claimed federal right, but few federal decisions have done so. An example is National Ed. Ass'n. v. Lee County Bd. of Public Instruction, 299 F Supp 834, 839 (MD Fla 1969), rev'd, 467 F2d 447 (5th Cir 1972) after certification to the Florida Supreme Court.

[6] Or Const art I, § 15:

"Laws for the punishment of crime shall be founded on the principles of reformation, and not of vindictive justice."

[7] Or Const art I, § 25:

"No conviction shall work corruption of blood, or forfeiture of estate."

to forbid excessive fines and disproportionately heavy penalties,[8] and, most relevant here, to confine "rigorous" treatment of prisoners within constitutional bounds of necessity. Or Const art I, § 13.[9]

Provisions like these have antecedents as early as New Hampshire's 1783 constitution,[10] coming to Oregon by way of Ohio and Indiana.[11] They reflect a widespread interest in penal reform in the states during the post-Revolutionary decades.[12] The clauses are not as universal as more familiar parts of the bills of rights, and ideas of humanitarian "reform" have changed with time and among the states. The Pennsylvania Constitution, among the first, provided that the penal laws were to be reformed and punishments made less "sanguinary" (i.e. bloody) by substituting imprisonment at hard labor, open for observation by the public. Penn. Frame of Government §§ 38, 39 (1776).[13] Practice often did not follow aspirations. Even in theory, a "Golden Age of Penology" could not be discerned

---

[8] Or Const art I, § 16:

> "Excessive bail shall not be required, nor excessive fines imposed. Cruel and unusual punishments shall not be inflicted, but all penalties shall be proportioned to the offense. . . ."

[9] Or Const art I, § 13:

> "No person arrested, or confined in jail, shall be treated with unnecessary rigor."

[10] "XVIII. All penalties ought to be proportioned to the nature of the offence. No wise legislature will affix the same punishment to the crimes of theft, forgery and the like, which they do to those of murder and treason; where the same undistinguishing severity is exerted against all offences; the people are led to forget the real distinction in the crimes themselves, and to commit the most flagrant with as little compunction as they do those of the lightest dye: For the same reason a multitude of sanguinary laws is both impolitic and unjust. The true design of all punishments being to reform, not to exterminate, mankind."

1 Schwartz, The Bill of Rights 377 (1971).

[11] *See* 3 Swindler, Sources and Documents of United States Constitutions (1974), Ohio Const 1802, art VIII, §§ 10, 14 in volume 7 at 554; and Indiana Const 1816, art I, §§ 12, 14-16 at 366 and article IX, § 4 at 374. The "unnecessary rigor" provision appeared as early as 1796. *See* Tenn Const 1796, art XI, § 13 in volume 9 at 148 (1979).

[12] *See generally,* Rothman, The Discovery of the Asylum 57-62, 71-100 (1971).

[13] Pennsylvania's leadership in originating the institution of the penitentiary (the Walnut Street Jail) reflected the tradition of William Penn and the Pennsylvania Quakers. *See* Teeters, The Cradle of the Penitentiary 1-12, 27-62 (1955).

before the 1870's.[14] In 1870 the Tennessee Constitution provided for "the erection of safe and comfortable prisons, the inspection of prisons, and the humane treatment of prisoners." Tenn Const art I, § 32. But while constitutional texts differ, the present point is that many states thought a commitment to humanizing penal laws and the treatment of offenders to rank with other principles of constitutional magnitude independently of any concern of the Congress or of Madison's Bill of Rights. The same commitment took the form of two interstate compacts adopted by Oregon and enacted as statutes, which provide that inmates of correctional institutions "shall be treated in a reasonable and humane manner." ORS 421.245, Art. IV(5); ORS 421.284, Art. IV(e). Oregon's article I, section 13 is in this tradition.[15]

It may well be that the interest asserted by the prisoners in this case can be brought within one of the kinds of "privacy" said to be protected by unexpressed

---

[14]

"There was little penal progress worthy of the name until the 1870's. A punitive philosophy predominated in the prison field and found expression in mass treatment, rigid repression and regimentation, silence rules, severe punishments, poor and insufficient food, confinement in small, unsanitary, poorly lighted cells, and lack of anything but the most rudimentary efforts at rehabilitation. The dollar sign was over the main gate of most institutions, and prison labor was exploited to the limit in chain gangs, contract shops and lease systems where shameful abuses went unchecked.

"The 1870's was a period which, it appeared at the time, might mark the beginning of a "Golden Age of Penology." In this decade the Elmira (New York) Reformatory, the first reformatory for men, was opened with a program having rehabilitation, or reformation, as its aim and utilizing parole systematically for the first time in this country. The first separate institutions for women were opened in Indiana and Massachusetts. The National (later American) Prison Association was organized and at its first Congress, held in Cincinnati in 1870, adopted a Declaration of Principles so advanced in thought that it was re-affirmed in 1930 with few basic changes. The first International Prison Congress, held in London in 1872, was attended by the leading American advocates of prison reform and the total atmosphere of that Congress also was one of progress."

Manual of Correctional Standards 11-12 (The American Correctional Association (3d ed 1966)).

[15] Equivalent clauses are found also in Georgia Const § 2-114 (1976) (". . . nor shall any person be abused in being arrested, while under arrest, or in prison"); Tenn Const art I, § 13 (1980); Utah Const art I, § 9 (1971); Wyo Const art I, § 16 (1977) ("No person arrested and confined in jail shall be treated with unnecessary rigor. The erection of safe and comfortable prisons, and inspection of prisons, and the humane treatment of prisoners shall be provided for.")

penumbras of the United States Constitution. *See Gunther v. Iowa State Men's Reform.,* 612 F2d 1079 (8th Cir 1980) *cert. den.* 446 US 966, 100 S Ct 2942, 64 L Ed 2d 825 (1980). But in three respects the guarantee not to be "treated with unnecessary rigor" in Oregon's article I, section 13, is a more cogent premise than such a federal "right of privacy."

First, it has an unquestioned source in a provision expressly included in the political act of adopting the constitution.

Second, that provision is addressed specifically to the treatment of persons "arrested, or confined in jail." Unlike rights of privacy, there can be no argument that rights under this guarantee are forfeited by conviction of crime or under lawful police custody, as those are the circumstances to which its protection is directed.

Third, "privacy" poses the paradox that its elasticity in the face of important public policies contradicts its theoretical premise as a right so fundamental as to be implied in the national Constitution; by contrast, article I, section 13, itself makes necessity the test of the practices it controls.

For these reasons, although in this case the considerations under "privacy" or under article I, section 13, are much the same, we proceed under the section of our own constitution directly addressed to prison practices.

II. *Opposite-sex Search as Indignity.*

The guarantee against "unnecessary rigor" is not directed specifically at methods or conditions of "punishment," which are the focus of article I, sections 15 and 16, as section 13 extends to anyone who is arrested or jailed; nor is it a standard confined only to such historically "rigorous" practices as shackles, the ball and chain, or to physically brutal treatment or conditions, though these are the most obvious examples. Thus the Indiana Supreme Court wrote, in sustaining a conviction of police officers for assault and battery on a prisoner:

"The law protects persons charged with crime from ill or unjust treatment at all times. Only reasonable and necessary force may be used in making an arrest, . . . 'no

person arrested, or confined in jail, shall be treated with unnecessary rigor,' section 15, art. 1, Const. . . . 'While the law protects the police officer in the proper discharge of his duties, it must at the same time just as effectively protect the individual from the abuse of the police.' U. S. v. Pabalan (1917) 37 Philippine 352, 354."

*Bonahoon v. State,* 203 Ind 51, 178 NE 570, 571, 79 ALR 453, 456 (1931).[16] "Unnecessary rigor" is not to be equated only with beatings or other forms of brutality. Thus Georgia's phrasing of the constitutional clause, *supra* note 15, is simply that prisoners shall not "be abused." Since it is "unnecessary" rigor that is proscribed, the first question under this clause is whether a particular prison or police practice would be recognized as an abuse to the extent that it cannot be justified by necessity.

There is no attempt in this case to broaden this principle so as to disregard the numerous and pervasive conditions intrinsic to the life of prisoners to which persons who have not forfeited their liberty would not willingly submit. Those sentenced to prison forfeit many rights that accompany freedom. Here there is no claim that the challenged "shakedown" or "patdown" searches in themselves were improper or could not properly be performed by officers of the same sex as the prisoners. Only the forced exposure to intimate touching by guards of the opposite sex, in the institutional context of the prison, is here claimed to invade the constitutionally protected sphere. In brief, the prisoners' objections are to the imposition of a needless indignity, to an invasion of the prisoners' residuum of personal dignity that is an imposition insofar as it goes beyond recognized necessity.

It is widely recognized, first, that even convicted prisoners retain claims to personal dignity, and also that under the conditions of arrest and imprisonment the relation between the sexes poses particularly sensitive issues. These assumptions underlie most contemporary statements of the relevant standards for penal institutions. Thus the Federal Standards for Corrections published by the Department of Justice postulate that "[e]ach facility develops and

---

[16] The Indiana section has also been cited to support tort recovery for physical abuse. *See Roberts v. State,* 159 Ind App 456, 307 NE2d 501 (1974); *Matovina v. Hult,* 125 Ind App 236, 123 NE2d 893 (1955).

implements policies and procedures governing searches and seizures to ensure that undue and unnecessary force, *embarrassment or indignity* to the individual is avoided." Specifically, when body searches are required, "staff personnel avoid unnecessary force and strive to preserve the *dignity and integrity* of the inmate."[17] Issues of dignity or embarrassment and indignity arising from sexual differences traditionally have been stated with a view of the rights of female prisoners. Standards for jails published by the Department's Bureau of Prisons stress, in connection with searches of newly admitted prisoners, that "[n]aturally, admission for women should be completely separate from that for men and should be conducted by female staff members." They continue with the advice that "[t]he following conditions must be met if difficulties are to be avoided in jails housing both male and female prisoners:

"1. Women prisoners must be completely separated from male prisoners, with no possibility of communication by sight or sound.

"2. All supervision of female prisoners must be by female employees. In the larger jail a full-time matron should provide constant supervision. Smaller jails may have a part-time matron who retains the key to the women's section and is on call as needed.

"3. Male employees must be forbidden to enter the women's section unless thay are accompanied by the matron."[18]

■ These federal standards reflect principles also found in nonofficial sources, such as the American Bar Association's Standards of Criminal Justice[19] and the

---

[17] Draft Federal Standards for Corrections 7, 36 (Department of Justice, June 1978) (emphasis added).

The kind of indignities at which these terms are directed are described in Schwartz, *Deprivation of Privacy as a "Functional Prerequisite": The Case of the Prison,* 63 J Crim L C & P S 229 (1972).

[18] The Jail: It's Operation and Management 19, 71-72 (United States Bureau of Prisons).

[19] The American Bar Association's standards relating to prison searches, while not referring specifically to distinctions of gender, states generally that "[i]n conducting searches of the person, correctional authorities should strive to preserve the dignity and integrity of the prisoner." Standard 6.6(f) *quoted in Tentative Draft of Standards Relating to the Legal Status of Prisoners,* 14 Am Cr L Rev 377, 400 (1977).

American Correctional Association's Manual of Correction-al Standards.[20] Indeed, the same principles have been a worldwide concern recognized by the United Nations and other multinational bodies.[21] The various formulations in these different sources in themselves are not constitutional law. We cite them here as contemporary expressions of the same concern with minimizing needlessly harsh, degrading, or dehumanizing treatment of prisoners that is expressed in article I, section 13. Thus the questions to be considered are whether a practice of body searches including sexually intimate areas by officers of the opposite sex, even though the prisoner remains clothed, constitutes a cognizable indignity and if so, whether it is justified by necessity.

---

[20]

"All handling and supervision of female prisoners must be by female employees. In the larger jails, 24-hour matron service should be provided; in the smaller jails service may be provided by a resident matron who will retain the keys to the women's quarters and be available whenever a female prisoner is received or discharged or whenever it is necessary to enter the women's quarters. Under no circumstances should male employees enter the women's quarters except in company with the matron, and no male prisoner should ever be permitted access to the women's quarters."

Manual of Correctional Standards 61 (The American Correctional Association, (3d ed, 1966)).

[21] The Universal Declaration of Human Rights, proclaimed "as a common standard of achievement" under the directive to "promote . . . universal respect for, and observance of, human rights" in Article 55 of the United Nations Charter, states in Article 5: "No one shall be subjected to torture or to cruel, inhuman or *degrading* treatment or punishment." (Emphasis added.) In the later International Covenant of Civil and Political Rights, this principle is repeated in Part III, Article 7 and further spelled out and expanded in Part III, Article 10:

"1. All persons deprived of their liberty shall be treated with humanity *and with respect for the inherent dignity of the human person.*

"2. (a) Accused persons shall, save in exceptional circumstances, be segregated from convicted persons, and shall be subject to separate treatment appropriate to their status as unconvicted persons;

"(b) Accused juvenile persons shall be separated from adults and brought as speedily as possible for adjudication.

"3. The penitentiary system shall comprise treatment of prisoners the essential aim of which shall be their reformation and social rehabilitation. Juvenile offenders shall be segregated from adults and be accorded treatment appropriate to their age and legal status." (Emphasis added.)

It must be recognized that what is or is not an indignity is largely a matter of social and individual psychology. Like "punishment," *see Brown v. Multnomah County Dist. Ct.,* 280 Or 95, 105-108, 570 P2d 52 (1977), a practice may appear to be so from the purpose of its imposition, or from the viewpoint of the prisoner, or in the perception of the general public. Moreover, such views may differ widely among individuals and change over time with changing social expectations about the relations between the sexes.

■ Here there is no claim that shakedowns by female guards were purposely designed to humiliate the prisoners. There is evidence, as one would expect, that different prisoners did not express the same reactions to being searched by the female guards as plaintiffs did. A psychologist employed at the prison estimated that perhaps a third of the prisoners considered the contacts involved in patdowns by female officers offensive. As to the view of such

---

The formulation of the Universal Declaration is used in Article 3 of the European Convention for the Protection of Human Rights and Fundamental Freedoms. [European] Convention for the Protection of Human Rights and Fundamental Freedoms, art 3, *signed* Nov. 4, 1950, *entered into force* Sept. 3, 1953, 213 U.N.T. 222. It was applied by the European Court of Human Rights in *Ireland v. United Kingdom,* judgment of Jan. 18, 1978 Series A no. 25 *reprinted in* 17 Int'l Legal Materials 680 (1978)(detention and interrogation practices held violative of art 3). In the American Convention on Human Rights the same formulation is followed by the sentence "All persons deprived of their liberty shall be treated with respect for the inherent dignity of the human person." American Convention on Human Rights, art 5, § 2, *signed* Nov. 22, 1969, *entered into force* July 18, 1978, 36 OAS Treaty Series 1, OAS Off. Rec. OEA/Ser L/V/II.23 doc. rev. 2.

The *Standard Minimum Rules for the Treatment of Prisoners* adopted by the First United Nations Congress on the Prevention of Crime and the Treatment of Offenders in 1955 and approved by the Economic and Social Council in 1957 (Resolution 663C (XXIV)) provide for the separation of male and female prisoners (Rule 8(a)) and for minimizing conditions "which tend to lessen the responsibility of the prisoners or the respect due to their dignity as human beings." (Rule 60(1).) *Contained in* the Report on the First United Nations Congress on the Prevention of Crime and the Treatment of Offenders (U.N. Pub., No.: 1956. IV. 4), *reproduced in* Compendium of Model Correctional Legislation and Standards at Compendium IV-10, IV-13 (American Bar Association and Council of State Governments, 1972). This expression of the United Nations in turn had antecedents in the League of Nations. *See* S. Rubin, The Law of Criminal Correction 286 n.7 (1963).

The history of these standards and their application is reviewed in Skoler, *World Implementation of the United Nations Standard Minimum Rules for Treatment of Prisoners,* 10 Jnl Int L & Econ 453 (1975).

contacts common in society at large, we think it is within the range of judicial knowledge without the need for evidence.

■ ■ The special significance accorded to intimate as distinct from ordinary touching is reflected in our criminal law, which singles out the unconsented but otherwise uninjurious "touching of the sexual or other intimate parts" for prosecution as a crime when it is sexually motivated. ORS 163.305(6), 163.415. The Court of Appeals referred to "the assumption that the final bastion of privacy is to be found in the area of human procreation and excretion," and that "[if] a person is entitled to any shred of privacy, then it is to privacy as to these matters." 44 Or App at 761. We agree that this still represents prevailing social assumptions. From this, the court further reasoned that "if a prisoner is entitled—absent an emergency—to be free of visual inspection by prison personnel while in the nude" (which prison officials conceded), "the prisoner is equally entitled to be free from the tactile equivalent of the nude inspection, *viz.,* manual examination of the anal-genital area through clothing." *Id.* Again, there should be no doubt that this equation would be recognized in society at large. If the same equation is denied in contacts between prisoner and guard, it can only be because the prisoner is expected to abandon his "outside" sense of personal dignity in matters of bodily privacy, which begs the question. Otherwise, such a manual search of one's private parts will be inoffensive only when it is granted to be a matter of necessity.

As mentioned above, these concerns traditionally arise in providing for the proper treatment of female prisoners. That prevailing social standards entitle women to be searched only by female officers is accepted as obvious without evidence of individual attitudes.[22] The superintendent of the Oregon Women's Correctional Center testified that male guards do not frisk female prisoners.

---

[22] There has, in fact, been some reconsideration whether the principle of total institutional isolation of female prisoners sometimes does more harm than good, *see* Note, The Sexual Segregation of American Prisons, 82 Yale L J 1229 (1973); ABA Std 6.13, *supra* n.17, *quoted in* 14 Am Crim L Rev at 404-405; but this does not extend to standards restricting the direct surveillance of female prisoners by male guards. An expression of this state's policy is found in ORS 137.350, which provides:

It may be too simple to assume that the reverse situation with respect to male prisoners is equally obvious. For ancient and continuing reasons, perhaps more women will fear or resent intrusive observation and touching by male officers than vice versa. The context is more important than formal equivalence. In the setting of medical and hospital care, women have long accepted the ministrations of male physicians and men have accepted those of female nurses and, more recently, female physicians; but there the health of the patient's body itself is the object and the purpose of the contact is to help. The hospital is not an adversary setting of mistrustful authority on one side and compelled subjugation on the other.

■ Formal equivalence aside, however, we know no reason to conclude that society denies to men in the prison setting a sense of the proprieties that it unquestioningly grants women in the same setting. Once this is granted, the question becomes whether body searches of male prisoners by female officers is justified by necessity.

### III. *The Equal Employment Policy.*

A necessity to conduct searches of male prisoners by female officers obviously does not arise from anything intrinsic to the searches themselves, nor from a shortage of skilled personnel such as might override a patient's preference to be handled only by doctors or nurses of the patient's own sex. If necessity can be claimed here, it arises from the

---

"If any woman or girl charged with a crime is sentenced to any place of confinement, she shall be accompanied to such place by a woman officer who shall be appointed and compensated in the same manner as provided in ORS 136.347."

ORS 137.360 likewise provides:

"(1) Whenever an order has been made by any court of this state for the confinement of any female within any of the penal, reformatory or eleemosynary institutions of this state and by reason thereof it becomes the duty of any judge to appoint any person to accompany the female to such institution, the judge shall appoint a woman for that purpose.

"(2) Whenever under the laws of this state it becomes the duty of the sheriff of any county to convey any female to any of the penal, reformatory or eleemosynary institutions of this state, the sheriff shall cause such person to be accompanied by a female attendant to the place of confinement."

state's policy of providing equal occupational opportunities to women.

During the pendency of these proceedings, this policy was expressly addressed by the Legislative Assembly. House Joint Resolution 29 (Or Laws 1979, p 1262) states:

> "(1) The Corrections Division of the Department of Human Resources of the State of Oregon shall:
>
> "(a) Continue to make every effort to hire and promote women in correctional classifications whithin the Corrections Division; and
>
> "(b) Continue to make temporary reasonable accommodations in its policies with respect to affirmative action so as to assure the rights of all involved."

Prisoners are among the persons "involved" in this accommodation.

The intervening officers in fact do not insist that their employment claims override such constitutional rights as the prisoners may have. They make two other contentions. One is that prisoners have no constitutionally protected interest in avoiding intimate touching by guards of the opposite sex. The other is that the circuit court acted prematurely without first giving corrections officials an opportunity to resolve the problem by administrative rules or requiring the prisoners to show why administrative remedies were inadequate.

Although, as stated above, we hold that prisoners do retain relevant constitutional rights, their relation to the officers' rights deserve additional comment. It should be understood that, despite the diverging objectives of the two groups, the law does not pit the rights of prisoners against those of corrections officers. The prisoners' rights, like all constitutional rights, run against the state. Similarly, the officers' rights to equal employment opportunities are claims upon the state. They are not suing the prisoners or asserting a right to search prisoners for its own sake; their interest is in sharing the economic and non-economic opportunities in an occupation in which government is effectively the only employer.

This point is illustrated in two recent decisions involving the claims of female corrections officers to assignments in an Iowa men's reformatory. In the first case, the Supreme Court of Iowa held under a state civil rights law that respect for the rights of male prisoners was a permissible reason for prison officials not to use women officers in certain assignments and locations. The court reached that conclusion even without an express exception in the law for "bona fide occupational qualifications" by finding the prisoners' rights to be of constitutional magnitude. *Iowa Dept. of Soc. Serv. v. Iowa Merit Emp. Dept.*, 261 NW2d 161, 165 (Iowa 1977). The complaining female officer asserted that her interest was in eligibility for the higher job classification involved, not in performing the disputed searches and related functions. However, the Iowa court concluded that the state's law tied the desired classification to these job functions and denied her claim.

The complaining officer thereupon pursued a federal remedy under Title VII of the Civil Rights Act, 42 USC § 2000e *et seq.* That act, in § 2000e-2(e), does make an exception from its general rules against employment discrimination when the employer can demonstrate that sex is a "bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." In *Gunther v. Iowa State Men's Reform., supra,* the court of appeals reached the opposite conclusion from the Iowa court's. The federal court found that the prison officials must show that they "could not reasonably rearrange job responsibilities in a way to minimize the clash between privacy interests of the inmates, and the nondiscrimination principle of Title VII" (612 F2d at 1086), and it also found that in fact female correction officers held the higher classification at the state's maximum security prison without performing the disputed functions, that Gunther herself performed some of the functions of the higher classification, and that some male officers were assigned to a single function rather than used generally for all jobs within that classification. The court concluded:

"If these job functions and procedures have not undermined the goals and functions of the reformatory at Anamosa, there is little reason to suggest that scheduling to avoid the invasion of inmate privacy rights by female

officers would give rise to undue hardship on the prison administration. Administrative inconvenience cannot justify discrimination. . . . Given this evidence, we believe the district court properly concluded Anamosa failed to demonstrate that there are no reasonably available alternative practices with less discriminatory impact that would satisfy the legitimate needs of the institution. . . ."

612 F2d at 1076.[23]

■ In the present case, the claim for relief before the trial court and this court is that of prisoners, not of corrections officers. As *Gunther* shows, the officers' employment rights are a separate issue. Such rights do not serve OSP as a reason why disregard of otherwise protected prisoner interests under article I, section 13, is "necessary" within the meaning of that section.[24] However, the trial court's order as written does touch on the officers' employment. This brings us to their second criticism, that the court should have required the prisoners first to seek an administrative remedy.

### IV. *The Injunction.*

Rules for the administration of the correctional institutions both as to the treatment of prisoners and as to the assignment of personnel are initially the responsibility of the Corrections Division and of the superintendent of each institution. ORS 421.016 provides:

"(1) The Superintendent of the Oregon State Penitentiary shall be the chief executive officer of the penitentiary.

. . . .

---

[23] In *Dothard v. Rawlinson,* 433 US 321, 97 S Ct 2720, 53 L Ed 2d 786 (1977), the Supreme Court found a bona fide occupational qualification for male guards at the Alabama maximum security prisons on grounds of security and physical safety. These and related cases are reviewed in Jacobs, The Sexual Integration of the Prison's Guard Force: A Few Comments on *Dothard v. Rawlinson,* 10 U Toledo L Rev 389 (1979); Comment, Sex Discrimination in Prison Employment: The Bona Fide Occupational Qualification and Prisoners' Privacy Rights, 65 Iowa L Rev 428 (1980).

[24] The officers argue that recognition of the prisoners' claims in this case might imply that police officers could not "frisk" persons of the opposite sex in the course of ordinary police work, but such contacts can be "necessary" in a different sense. For this reason, also, we do not pursue the officers' first assignment of error, that the trial court should have admitted evidence that police officers of either sex "frisk" suspects in a manner similar to the regular and repeated patdown searches of inmates at issue here.

"(4) The superintendents:

"(a) Shall keep all inmates safely, according to law and the rules of the Corrections Division.

. . . .

"(c) May each prescribe rules for the government of the inmates, subject to the approval of the administrator." [25]

The Administrator of the Corrections Division in fact has promulgated extensive rules governing the conduct of searches and inspections in the division's facilities which incorporate many of the standards mentioned in sources cited above. *See* OAR 291-41-005 to OAR 291-41-050 (1980).

Because of this initial agency responsibility, the timing and nature of judicial remedies are an aspect of administrative law.[26] When a rule is challenged apart from a specific order, ORS 183.400(1) places jurisdiction for judicial review in the Court of Appeals, and the petitioner need not first request the agency to pass on the validity of its rule.[27] When a rule is challenged in the course of reviewing an order, its validity may be determined by the court that otherwise has jurisdiction to review the order.[28] Correction Division orders "issued to" persons sentenced to its custody, however, are excluded from the judicial review section of the APA. ORS 183.315(5).

---

[25] Prisoner disciplinary procedures are further subject to approval of the governor, ORS 421.180, and *cf.* the interstate compacts cited *supra.*

[26] This aspect led two judges to dissent in *Iowa Dept. of Soc. Serv. v. Iowa Merit Emp. Dept., supra,* 261 NW2d at 167-169 (Uhlenhopp, J., dissenting, joined by McCormick, J.).

[27] ORS 183.400(1):

"The validity of any rule may be determined upon a petition by any person to the Court of Appeals in the manner provided for review of orders in contested cases. The court shall have jurisdiction to review the validity of the rule whether or not the petitioner has first requested the agency to pass upon the validity of the rule in question, but not when the petitioner is a party to an order or a contested case in which the validity of the rule may be determined by a court."

[28] ORS 183.400(2):

"The validity of any applicable rule may also be determined by a court, upon review of an order in any manner provided by law or pursuant to ORS 183.480 or upon enforcement of such rule or order in the manner provided by law."

 But "rules" and "orders" within the Oregon Administrative Procedure Act—terms originally conceived to describe regulatory actions addressed to private parties and later expanded to include actions addressed to agency beneficiaries and employees, *see* ORS 183.310—do not exhaust the types of official action against persons in state institutions. A body search is not an "order," although an order to submit to a search may be. Consequently the Administrative Procedure Act does not confine judicial relief in this case, which was not brought as an attack on a rule or an order, within the act's procedures for review of such actions, and equitable intervention was not precluded on that score. Nor need all relief be withheld when the impact of the assertedly unlawful agency action is present or immediately impending. The "protection of the law" to which ORS 421.105(2) entitles an inmate facing actual or threatened "injury" is timely protection.[29] Specifically in the custodial setting, what we have called a "flexible" remedy by injunction or temporary restraining order is proper to obviate expansive resort to the most urgent of all judicial scrutiny of executive action, the writ of habeas corpus. *Penrod/Brown v. Cupp,* 283 Or 21, 27, 581 P2d 934 (1978). Accordingly, the circuit court had authority to act without awaiting a possible change of OSP's deliberately chosen policies.

 The price of timely injunctive intervention, however, is to remain within the bounds of its necessity and leave long-range solutions to the normal process of initial administrative rulemaking and judicial review. Circumstances may make injunctive intervention appropriate, as in this case, but if the responsible agency accepts the principle giving rise to that intervention as part of its own rules and policies the need for a continued injunction eventually terminates. Moreover, circumstances may change in years to come, possibly including the views of future prison generations.

---

[29] ORS 421.105(2):

"The person of an inmate sentenced to imprisonment in the penal or correctional institution is under the protection of the law and he shall not be injured except as authorized by law."

We note that during the pendency of OSP's appeal, the Corrections Division in fact has amended the administrative rules cited above to comply with the court's order. OAR 291-41-005 now provides:

> "It is further the policy of the Corrections Division that any searches of the person will be performed by a person of the same sex as that of the person being searched, except when qualified medical personnel are utilized to conduct internal searches, and except in emergency situations as defined in this rule."

OAR 291-41-020(3) was amended to add provisions that "unnecessary force, embarrassment, or indignity to the inmate will be avoided. Whenever feasible, inspection devices may be used instead of body searches," and a new paragraph (7):

> "Except in an emergency, only same sex (male/female) Corrections Division personnel may, as part of their regular and frequent duties, observe inmates (male/female) in open showers, in toilets, in the nude or carry out frisk and/or skin searches, manual examinations of the anal, genital area(s) through the clothing and/or supervise the taking [of] urine samples for drug surveillance purposes."

An "emergency situation" is defined as the "occurrence of an unforeseen circumstance requiring immediate implementation of remedial action." OAR 291-41-010(4).

■ These rules expressly incorporate and are designed to effectuate the principle against needless "force, embarrassment, or indignity" stated in this opinion. However, the rules appear to have been adopted only in response to the circuit court's order, and there is no basis to assume that they would be maintained if the defendants were led to believe that they were legally free to resume the challenged practice. Moreover, the appeal from the injunction has been pursued below and argued in this court not only by OSP but also by the female officers, who were intervenors in the circuit court. The rules are not stated in terms of the *assignment* of female officers, as the circuit court's injunction is, but the injunction can be modified in this respect along the lines suggested by the Court of Appeals.[30]

---

[30] The Court of Appeals believed that the order could be read "to require nothing more than that guards of the opposite sex may not—absent an emergency—conduct a through the clothing frisk of a prisoner's anal-genital area." 44 Or App at 762 n.4.

When it is modified, the rules can be administered consistent with the legislative policy supporting employment of female corrections officers stated in HJR 29, *supra.* For these reasons, adoption of the rules does not have the effect of depriving the defendants and intervenors of the right to maintain their appeal.

The defendants may move to vacate the injunction on the ground that by adopting OAR 291-41-005 and OAR 291-41-020, *supra,* they will adequately regulate the challenged practice, so that continued judicial intervention is unnecessary and inappropriate. If they do so, the circuit court can make that determination in the first instance.

### V. *Conclusion.*

■ To summarize: The circuit court and the Court of Appeals correctly recognized that prisoners can raise a constitutionally founded objection to a search by corrections officers of the opposite sex that involves touching of sexually intimate body areas even through clothing. The source is Oregon Constitution article I, section 13. Under that section, the objection is overcome when and to the extent that the circumstances of the specific search make its performance by an officer of the opposite sex "necessary," but the employment of male or female corrections officers as such does not provide a blanket "necessity."

■ The injunction in this case was improperly phrased by being directed at the positions to which female corrections officers can be assigned. This impinges on the employment rights of the officers and on the flexibility of OSP to accommodate those rights to the rights of the prisoners, as contemplated in HJR 29, *supra.* The injunction is therefore modified to enjoin only that guards of the opposite sex may not conduct a "patdown," "frisk," or other search of plaintiffs' anal-genital area except in the event that the immediate circumstances in a particular situation necessitate it.

Subsequent to the injunction, the Corrections Divison has promulgated new rules which appear to meet the objective of the injunction. Neither the effect of these rules nor the question whether they are meant to survive or only to carry out the injunction is before us on the present

record. If the defendants intend to abide by these regulations and therefore move the circuit court to vacate the injunction, that court can determine whether there is any reason why continuation of this or another judicial order is necessary.

Affirmed as modified.

**TONGUE, J.,** specially concurring.

I concur in the result reached by the majority insofar as it holds that male prisoners cannot be subjected to searches by female guards involving touching of genital or anal areas except in emergencies. I do not, however, agree with the grounds on which the majority opinion is based, not only because I believe them to be wrong, but also because they are based upon a theory wholly different from the theory on which the case was both tried and appealed to the Court of Appeals.

1. *This court cannot properly decide this case on a theory wholly different from the theory on which this case was both tried and appealed.*

This case was tried on the theory that male prisoners have a "right of privacy" which is entitled to protection against searches by female guards involving touching of genital and anal areas. The written opinion by the trial court which provided the basis for its injunction was expressly based upon the prisoner's constitutional "right of privacy." The briefs by the parties in the appeal to the Court of Appeals were confined to a debate of that question. The majority opinion by that court affirmed the holding by the trial court that prisoners have a constitutional right of privacy which is violated by such searches. The petition for review, although challenging the correctness of that holding, did not suggest any alternative basis for decision.

On June 25, 1980, this case was argued in this court. Again, the arguments were directed solely to the question whether prisoners have such a constitutional right of privacy. As of December 31, 1980, this case was one of the "assigned but unwritten" cases which had been assigned to a member of the court for the writing of a proposed opinion, but for which no proposed opinion had yet

been written.[1] However, by letter dated January 14, 1981, from the court to attorneys for the parties, supplemental briefs were requested on the question whether prisoners, instead of having a constitutional "right of privacy," have a constitutional right to protection against treatment with "unnecessary rigor" under Article I, § 13 of the Oregon Constitution as a basis for protection against such searches. Thus, by that letter this court suggested to the parties a basis for decision of this case different from the basis upon which the case had been decided by either the trial court or the Court of Appeals.

It has been held repeatedly by this court that it will not decide a case on appeal on a theory wholly different than the theory on which the case was tried. As stated in *Edwards, Guardian, v. Hoevet,* 185 Or 284, 297, 200 P2d 955 (1949):

"A familiar rule of appellate practice restricts the appellant to the theory he pursued in the trial court. He can not in this court raise issues that he did not present and rely upon in the circuit court: *Johnson v. Davidson,* 168 Or. 379, 123 P.2d 179; *Harlow v. Chenoweth,* 158 Or. 343, 75 P.2d 937; *Pelton v. General Motors Acceptance Corp.,* 139 Or. 198, 9 P.2d 128, 7 P.2d 263. We deem it unnecessary to burden this page with additional citations from our reports; the rule just stated is universally applied: * * *."

As further stated in *Stotts v. Johnson and Marshall,* 192 Or 403, 420, 234 P2d 1059, 235 P2d 560 (1951):

"The rule prevents the appellant and the respondent alike from reaching out upon appeal for views concerning the facts and the issues which are inconsistent with or different from those which the party took in the trial court. The rule recognizes that an appellate court is a court of review and thus the operation of the rule restricts the scope of review."

More recent cases in which this rule has been applied by this court include *Nordling v. Johnston,* 205 Or 315, 340, 283 P2d 994, 287 P2d 420 (1955); *Chaney v. Fields Chevrolet Co.,* 258 Or 606, 613, 484 P2d 824 (1971), and *Judson v. Terry Morgan Const.,* 273 Or 666, 673-74, 542 P2d 1010 (1975).

[1] See concurring opinion in *State v. Quinn,* 290 Or 383, 407, 623 P2d 630 (1981), on the subject of delays in appeals to this court, with comparative statistics.

If the adversary process, which is basic to our system of jurisprudence, is to be respected, the fact that this court is now a court of review, rather than a court of direct appeal, cannot properly justify a different result because to hold to the contrary would leave the parties free on petitions for review to propose, if not demand, that this court reverse either the trial court or the Court of Appeals for reasons based upon theories completely different from the theory upon which the case was both tried and appealed to the Court of Appeals.

For these reasons, I cannot concur in the majority opinion in this case because it decides this case on a theory completely different from the theory on which this case was both tried and appealed to the Court of Appeals. In addition, I do not agree with the new theory on which the majority decides this case for additional reasons.

2. *The constitutional right of prisoners to be protected from "treatment with unnecessary rigor" as a ground to prohibit "pat-down" searches by guards of the opposite sex.*

The opinion by the majority is indeed a scholarly opinion. I do not, however, agree with the majority in its holding that prisoners have a constitutional right under Article I, § 13 of the Oregon Constitution to protection against such searches. It may be, for reasons stated by the majority, that to hold that prisoners have a constitutional "right of privacy" is to adopt a concept subject to the criticism that "[a] concept in danger of embracing everything is a concept in danger of conveying nothing," and that the law should not "pay [such] a price in clarity and cogency," as stated by the majority.

To me, however, the concept that a prisoner's constitutional right to be protected against treatment with "unnecessary rigor" is subject to much the same criticism, particularly when extended to what prisoners may consider to be "unnecessary" searches. I am also concerned that to confer upon prisoners a constitutional right to object to such searches may open a Pandora's Box from which prisoners may, by habeas corpus or otherwise, deluge the courts with litigation based upon claims that many of the rules and practices customary in the operation of penal institutions are "unnecessarily rigorous."

If required to choose between a constitutional "right of privacy" and a constitutional right to object to "treatment" which is "unnecessarily rigorous," I would choose the former for the reasons stated by the majority opinion of the Court of Appeals, despite its conceptual problems. Indeed, the majority states that:

> "It may well be that the interest asserted by the prisoners in this case can be brought within one of the kinds of 'privacy' said to be protected by unexpressed penumbras of the United States Constitution. *See Gunther v. Iowa State Men's Reform.,* 612 F 2d 1079 (8th Cir 1980) *cert. den.* 446 US 966, 100 S Ct 2942, 64 L Ed 2d 825 (1980)." (p. 618-19.)

If, however, some other basis must be found for decision of this case, it is my view that this case can be properly decided without the necessity of finding a constitutional basis for prisoners' rights, thus "engraving them in stone" beyond the reach of the legislature.

First of all, the right of privacy has a basis in ordinary tort law, subject to protection in civil litigation. By reason of. ORS 137.275 prisoners in Oregon retain all civil rights, including the right to maintain civil actions or suits, "except as otherwise provided by law."

Furthermore, and aside from the question whether prisoners may have such a "right of privacy," enforceable by civil actions or suits, the majority calls attention to ORS 421.245, Art. IV(5) and ORS 421.284, Art. IV(e) which require that inmates of correctional institutions "shall be treated in a reasonable and humane manner." (p. 618). The majority also refers to Federal Standards for Corrections published by the Department of Justice which provide, among other things, that "[a]ll supervision of female prisoners must be by female employees." (p. 621).

The majority goes on to say:

> "That prevailing social standards entitle women to be searched only by female officers is accepted as obvious without evidence of individual attitudes. The superintendent of the Oregon Women's Correctional Center testified that male guards do not frisk female prisoners." (p. 624).

and that:

"Formal equivalence aside, however, we know no reason to conclude that society denies to men in the prison setting a sense of the proprieties that it unquestioningly grants women in the same setting." (p. 625).

I am in complete agreement with these statements. Indeed, at the time of oral argument counsel representing the women guards who demand the right to make "pat down" searches of the genitals and anal areas of male prisoners conceded that if male prisoners have no right to object to such searches by female guards, it would follow that female prisoners would have no right to object to such searches by male guards.

My point, however, is that these "standards" provide an ample and proper basis for a holding that to require male prisoners to be subjected to "pat down" searches of genital and anal areas by female guards, except in emergencies, is contrary to the provisions of ORS 421.245 and 421.484, which requires that prisoners "shall be treated in a reasonable and humane manner." *Cf. Gunther v. Iowa State Men's Reform.*, 612 F 2d 1079 (8th Cir 1980) *cert. den.* 446 US 966 (1980), also cited by the majority. (p 619). Such a basis for decision would leave the subject of what is "reasonable and humane treatment" within the control of the Oregon Legislature, subject only to constitutional limitations.

**TANZER, J.,** dissenting.

I disagree with the majority as a matter of degree rather than of theory. I believe as a matter of firm conviction that the courts should intervene into the management of prisons only with great restraint and only for reasons of sufficient magnitude to justify extraordinary action. I do not suggest that constitutional rights of prisoners should be protected with less vigor than the rights of others. Rather, it is my profound belief that courts should not regard the federal or the Oregon constitutions as licenses for the imposition of judicially preferred practices upon the prison system.

The controlling fact of this case is that there is no challenge to the authority of the state to subject plaintiffs to searches. The only challenge is to the authority of the

to searches. The only challenge is to the authority of the state to have the searches performed by persons of either sex.

For that reason, I see no violation of plaintiffs' reasonable expectation of privacy. They concede that their privacy may be intruded upon. As prisoners, plaintiffs' expectation of privacy is not lessened and their exposure to searches is not enlarged according to the sex of the person searching.

I agree that the constitutional term "unnecessary rigor" applies to penal action which abuses prisoners physically or emotionally. Bread and water, torture, exhausting labor, public display, inadequate shelter and emotional harassment come to mind as examples of the kinds of physical or emotional torment which the "unnecessary rigor" clause was intended to prevent. Pat-down searches by persons of either sex does not come anywhere close to the magnitude of those examples of rigor, although subjection to heterosexual or homosexual fondling or sexual activity by guards would be. I see no evidence that the "unnecessary rigor" clause was intended to authorize the courts to enforce standards of delicacy or courtesy among adults in prison in the name of the constitution. Standards formulated by organizations and institutions such as the American Bar Association and the United Nations are worthy of respectful attention from the legislature or the executive branch, but they are no substitute for the constitution and they do not provide a mandate for judicial intervention.

The conduct of otherwise permissible searches by persons of either sex is not a breach of fundamental civility which is constitutionally forbidden as "unnecessary rigor." For these reasons, the injunction should have been denied.

Peterson, J., joins in this dissenting opinion.