Argued and submitted February 8, judgments of conviction for aggravated murder affirmed, sentences of death vacated and case remanded to the trial court for further proceedings September 20, 1990

# STATE OF OREGON,
## *Respondent,*

### *v.*

# RANDY LEE GUZEK,
## *Appellant.*

## (TC 87-CR-0373-TM; SC S35051)

797 P2d 1031

Michael Mills, Salem, argued the cause and filed the brief on behalf of appellant. With him on the brief was Mills & McMillin, P.C., Salem.

Timothy A. Sylwester, Assistant Attorney General, Salem, argued the cause and filed the brief on behalf of respondent. With him on the brief were Dave Frohnmayer, Attorney General, Virginia L. Linder, Solicitor General, and Jonathan H. Fussner, Diane S. Lefkow, and Brenda J Peterson, Assistant Attorneys General, Salem.

Before Peterson, Chief Justice, and Carson, Jones,* Gillette, Van Hoomissen, Fadeley and Unis, Justices.

GILLETTE, J.

---

* Jones, J., resigned April 30, 1990.

## GILLETTE, J.

This criminal case is before us on automatic review of defendant's conviction of aggravated murder and sentence of death. ORS 163.150(1)(f). Defendant raises various challenges to both the guilt and penalty phases of his trial. The guilt phase challenge is not well taken. We therefore affirm defendant's conviction for aggravated murder. The penalty phase, however, was erroneously conducted. We therefore vacate defendant's sentence of death and remand the case for a new penalty phase proceeding.

### FACTS

The facts surrounding this vicious crime can be stated briefly. Defendant, who was 18 years old at the time of the offense, had dated a high school acquaintance during the 1986-87 school year. The high school acquaintance at the time lived with her uncle and aunt, Rod and Lois Houser, at Terrebonne, a rural community in Deschutes County. Rod Houser disapproved of defendant; Houser's niece broke off the relationship. The parting was not amicable; defendant resented both the niece and her uncle.

On Sunday, June 28, 1987, defendant met with two friends, Mark Wilson and Ross Cathey. The three men planned to burglarize a rural Deschutes County home where they believed a large amount of jewelry was kept. Defendant, who was the leader and planner in the group, instructed Cathey to cut the throat of their prospective victim with a knife that defendant supplied. Cathey agreed. That plan failed, however, when there turned out to be too many lights and too many cars at the targeted residence when the conspirators arrived.

Thwarted, the three men started to drive back toward Redmond, the nearest town. They were continuing to look for a house to burglarize. Cathey suggested the Houser residence, which he and Wilson had remarked upon earlier that day as a possible target for a burglary. All three agreed on this alternate target.

The three returned to the home in Redmond that defendant shared with his father. There, defendant secured two guns (a .22 rifle and a .32 pistol) to be used in robbing the Housers. The three then departed for the Housers'. On the

way, they stopped at a secluded spot and defendant test fired the rifle, showing Wilson how to clear the action of the weapon if it jammed. The journey resumed.

Somewhere during the drive it seems to have been settled that, if the Housers proved to be home when the three arrived, the couple would be killed. The Housers were at home.[1] Defendant rang the doorbell and pounded on the door until Rod Houser finally answered it. A short, hostile discussion between defendant and Rod Houser ensued. Defendant then yelled "Do it!" to Wilson, who began firing the .22 at Rod Houser. Rod Houser retreated into the house, where he was felled by a fatal fusillade from the .22. Defendant ran upstairs and shot Lois Houser three times with the .32 pistol, killing her.

The men then ransacked the Houser residence, taking a great deal of personal property, including a ring that defendant pulled from Lois Houser's finger after he had murdered her. The men took the property to Redmond and stored it in various locations through the help of defendant's father.

The Housers' bodies were discovered two days after the murders. Suspicion came to center on defendant and Wilson, due to the enmity between defendant and the Housers. Eventually, police arrested defendant, Wilson, and Cathey. Wilson and Cathey confessed, implicating defendant. Both men testified against defendant at his trial. The state permitted each to plead guilty to a reduced charge in return for his testimony. A jury convicted defendant of both murders. The present appeal followed.

## GUILT PHASE

■ Defendant raises only one challenge that could be said to apply to the guilt phase of the proceedings in his case: He should have been given plea agreement opportunities equal to those given to Mark Wilson. A principal difficulty with defendant's argument, in addition to the fact that he made no issue of this question at the time,[2] is that defendant — unlike

---

[1] The niece was not there.

[2] Defendant did not make any such assertion on the record below, and this court would be justified in ignoring the issue on that ground alone. However, because this defendant faces the death penalty and a resolution of the issue in his favor could obviate the need for any retrial, we choose to consider the issue as a matter of discretion. For a discussion of the standards this court utilizes in exercising such discretion see *State v. McDonnell,* 310 Or 98, 794 P2d 780 (1990) (death penalty case).

Wilson — has steadfastly maintained that he had nothing to do with the crime. (Defendant even put on an alibi defense at trial, but it was rejected by the jury.) Defendant therefore has consistently taken the position that he is not in the same position as Wilson. *See State v. McDonnell,* 310 Or 98, 794 P2d 780 (1990) (discussing ORS 135.405 and ORS 135.415,[3] deal-

---

[3] ORS 135.405 states:

"(1) In cases in which it appears that the interest of the public in the effective administration of criminal justice would thereby be served, and in accordance with the criteria set forth in ORS 135.415, the district attorney may engage in plea discussions for the purpose of reaching a plea agreement.

"(2) The district attorney shall engage in plea discussions or reach a plea agreement with the defendant only through defense counsel, except when, as a matter of record, the defendant has effectively waived the right of the defendant to counsel or, if the defendant is not eligible for court-appointed counsel, has not retained counsel.

"(3) The district attorney in reaching a plea agreement may agree to, but is not limited to, one or more of the following, as required by the circumstances of the individual case:

"(a) To make or not to oppose favorable recommendations as to the sentence which should be imposed if the defendant enters a plea of guilty or no contest to the offense charged;

"(b) To seek or not to oppose dismissal of the offense charged if the defendant enters a plea of guilty or no contest to another offense reasonably related to the defendant's conduct; or

"(c) To seek or not to oppose dismissal of other charges or to refrain from bringing potential charges if the defendant enters a plea of guilty or no contest to the offense charged.

"(d) Similarly situated defendants should be afforded equal plea agreement opportunities."

ORS 135.415 states:

"In determining whether to engage in plea discussions for the purpose of reaching a plea agreement, the district attorney may take into account, but is not limited to, any of the following considerations:

"(1) The defendant by the plea of the defendant has aided in ensuring the prompt and certain applications of correctional measures to the defendant.

"(2) The defendant has acknowledged guilt and shown a willingness to assume responsibility for the conduct of the defendant.

"(3) The concessions made by the state will make possible alternative correctional measures which are better adapted to achieving rehabilitative, protective, deterrent or other purposes of correctional treatment, or will prevent undue harm to the defendant from the form of conviction.

"(4) The defendant has made public trial unnecessary when there are good reasons for not having the case dealt with in a public trial.

"(5) The defendant has given or offered cooperation when the cooperation has resulted or may result in the successful prosecution of other offenders engaged in equally serious or more serious criminal conduct.

"(6) The defendant by the plea of the defendant has aided in avoiding delay

ing with how a person qualifies for consideration for equal plea agreement opportunities).

Moreover, this record reflects ample justification for the District Attorney's decision to treat Wilson and defendant differently. Defendant was the leader of this gang; Wilson was a follower. The deaths of the Housers appear to have been the particular desire of defendant, who had a prior grudge against Rod Houser. Defendant supplied the murder weapons. Defendant had a history of vandalism and threatening acts, including one incident in which he told a woman he wished he had a gun with him so he could kill her. On this record, there is no basis for positing error in the decision of the District Attorney to offer a plea agreement to Wilson while not offering a similar one to defendant. *See State v. Farrar,* 309 Or 132, 138-42, 786 P2d 161 (1990) (death penalty case using the same analytical methodology).

The foregoing assignment of error is the only one relating to the guilt phase and is not well taken. Defendant's convictions on both counts of aggravated murder are affirmed. We turn to the penalty phase arguments.

## PENALTY PHASE

Defendant makes three assignments of error with respect to the penalty phase. The first contains eight subparts. We shall address these assignments in the order in which defendant presents them.

### Assignment of Error No. 1

In this assignment of error, defendant mounts a massive, head-on attack on the constitutionality of Oregon's constitutional and statutory death penalty scheme. As all of defendant's arguments in this regard have previously been dealt with by other decisions of this court, we need note them only briefly.

### A. Vagueness

Defendant first argues that the capital sentencing

---

in the disposition of other cases and thereby has increased the probability of prompt and certain application of correctional measures to other offenders."

statute, ORS 163.150, is so vague and standardless that it will result in arbitrary application. This court rejected virtually identical arguments in *State v. Montez,* 309 Or 564, 606, 789 P2d 1352 (1990); and *State v. Farrar, supra,* 309 Or at 184-86.

*B. Question of "future dangerousness"*

Defendant next argues that the concept of "future dangerousness" in ORS 163.150 is constitutionally insufficient to guide the jury's discretion and prevent arbitrary or capricious imposition of the death penalty. We held to the contrary in *State v. Wagner,* 305 Or 115, 150-55, 752 P2d 1136 (1988), *vacated on other grounds and remanded sub nom Wagner v. Oregon,* 492 US 914, 109 S Ct 3235, 106 L Ed 2d 583 (1989) *(Wagner I).* We adhere to that ruling.

*C. Lack of clarity in number of votes required for negative answer to special verdict questions*

Defendant argues that because ORS 163.150 does not clearly provide for the number of votes required to answer any of its special verdict questions in the negative, the statute is unconstitutionally vague. However, since this case was argued, we have held that a single juror's "no" vote requires that the special verdict form question be answered in the negative. *State v. Moen,* 309 Or 45, 95, 786 P2d 111 (1990). This argument is not well taken.

*D. Limits on ability to consider mitigating evidence*

■ Defendant next argues that ORS 163.150 impermissibly limits the way in which an Oregon jury can consider mitigating evidence concerning a defendant. As a facial attack on the statute, this argument is not well taken. As construed by this court after remand from the United States Supreme Court, a jury impanelled under the statute must be given the full range of authority to consider and act on mitigating evidence that the federal Constitution requires. *State v. Wagner,* 309 Or 5, 14-20, 786 P2d 93 (1990) *(Wagner II).* However, *Wagner II* was not decided until after this case was tried. As a consequence, the actual jury instructions given in this case did not meet the constitutional requirements this court identified in *Wagner II.* As a result, defendant did not receive a proper penalty phase trial. Defendant's sentence of death therefore must

be vacated, and the case remanded for a new trial on the sentencing phase or, at the election of the District Attorney, for entry of a life sentence for defendant. *Wagner II, supra,* 309 Or at 20; *State v. Farrar, supra,* 309 Or at 177-78.

### E. The statute eliminates personal responsibility for imposition of the death penalty

Defendant next argues that, by directing the jury only to answer the special verdict questions and then directing the trial judge, if the answer to the questions is yes, to impose a sentence of death, ORS 163.150 "eliminates any personal responsibility for imposition of the death penalty." This court rejected the same argument in *Wagner I, supra,* 305 Or at 155-56.

### F. Death penalty as "unnecessary rigor"

■ Defendant argues that imposition of the death penalty constitutes treatment of an offender with "unnecessary rigor," in violation of Article I, section 13, of the Oregon Constitution.[4] By its terms, Article I, section 13, of the Oregon Constitution is concerned with conditions within a prison. *Sterling v. Cupp,* 290 Or 611, 619-22, 625 P2d 123 (1981). The death penalty is not such a circumstance. Article I, section 13, is not relevant. *See also State v. Moen, supra,* 309 Or at 97 (Article I, section 13, not offended by anxiety caused by pretrial detention of aggravated murder defendant).[5] This argument is not well taken.

### G. The statute does not provide for meaningful appellate review

Defendant next argues that ORS 163.150(1)(f), by providing only that "[t]he judgment of conviction and sentence of death shall be subject to automatic and direct review by the Supreme Court," does not provide for adequate or meaningful review as required by the Due Process and Equal

---

[4] Article I, section 13, Oregon Constitution, provides:

"No person arrested, or confined in jail, shall be treated with unnecessary rigor."

[5] This is not to say that the particular *way* in which the death penalty is administered could not be subject to scrutiny under section 13, but that is not defendant's theory here.

Protection Clauses of the Fourteenth Amendment to the United States Constitution. We rejected such arguments in *Wagner I, supra,* 305 Or at 167-71. We adhere to that view.

*H.   Imposition of death penalty will be arbitrary and capricious*

Finally, defendant argues that, under the death penalty imposition regime created by ORS 163.150, it is virtually certain that the penalty will be applied in a standardless, haphazard and totally unpredictable way. To the extent that this argument is derived from defendant's assumption that his other seven attacks on the statute are well taken, this argument fails. Moreover, this court directly rejected a virtually identical attack on the efficacy of the statutory scheme in *Wagner I, supra,* 305 Or at 146-50. We adhere to that view.

*Assignment of Error No. 2*

Defendant argues that the jury instructions given in the present case did not afford him a full, constitutionally required opportunity to have the jury consider his mitigating evidence. As already noted, we agree. A new penalty phase hearing must be held.

*Assignment of Error No. 3*

■    Finally, defendant asserts that there was not sufficient evidence of his future dangerousness to permit that issue to go to the jury and, therefore, his sentence of death must be reversed as a matter of law. To the contrary, there was ample evidence that this defendant is and will continue to be a danger, not merely to those who oppose him openly (as did the victim Rod Houser) but also to those who merely happen to have the misfortune to be in his way (such as the intended burglary/robbery/murder victim whose well-lighted home deterred defendant and his accomplices on the very night the present murders were committed).[6] The evidence is more than sufficient to permit a jury to conclude that this defendant is a young and remorseless killer who, given the opportunity, will commit many other crimes of violence.

---

[6] There was a great deal of other evidence, including expert testimony, that also indicated that defendant will continue to be a danger to the public, but no purpose would be served by setting it out here.

## CONCLUSION

Judgments of conviction for aggravated murder affirmed. Sentences of death vacated. Case remanded to the trial court for further proceedings.