No. 47　　　　November 27, 2015　　　　251

# IN THE SUPREME COURT OF THE
## STATE OF OREGON

STATE OF OREGON,
*Respondent on Review,*

*v.*

RANDY LEE GUZEK,
*Appellant on Review.*

(CC 87CR-0373-TM; SC S058677)

On automatic and direct review of the judgment of conviction and sentences of death imposed by the Deschutes County Circuit Court.*

Argued and submitted March 9, 2015.

Jeffrey E. Ellis, Portland, argued the cause and filed the briefs for appellant on review. With him on the briefs was Karen A. Steele, Salem.

Timothy A. Sylwester, Assistant Attorney General, Salem, argued the cause and filed the briefs for respondent on review. With him on the briefs were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Michael J. Slauson, Gregory A. Rios, and Jona J. Maukonen, Assistant Attorneys General.

Stephen F. Deatherage, Bullivant Houser Bailey PC, Portland, filed the brief for *amicus curiae* Douglas Houser.

Before Walters, Presiding Justice, Brewer and Baldwin, Justices, and Durham and Riggs, Senior Justices pro tempore.**

WALTERS, P. J.

The sentences of death are affirmed.

_____
　*　Appeal from Deschutes County Circuit Court Thomas M. Mosgrove, Judge (Judgment of Conviction); Jack A. Billings, Judge (Judgment of Sentencing).

　**　Balmer, C.J., and Kistler, Linder, and Landau, JJ., did not participate in the consideration or decision of this case.

**WALTERS, P. J.**

Defendant was convicted of two counts of aggravated murder in 1988. This court affirmed those convictions in *State v. Guzek*, 310 Or 299, 797 P2d 1031 (1990) (*Guzek I*), but has three times vacated defendant's sentences of death and remanded for new penalty-phase trials. *See id.*; *State v. Guzek*, 322 Or 245, 906 P2d 272, 274 (1995) (*Guzek II*); *State v. Guzek*, 336 Or 424, 86 P3d 1106 (2004) (*Guzek III*), *vac'd and rem'd,* 546 US 517, 126 S Ct 1226, 163 L Ed 2d 1112 (2006) (*Guzek IV*), *modified,* 342 Or 345, 153 P3d 101 (2007) (*Guzek V*). This is an automatic and direct review of the death sentences imposed on defendant after his fourth penalty-phase trial, which occurred in 2010.

Defendant raises 87 assignments of error. Discussion is merited for only 13 assignments of error, which fall into two categories. First, defendant contends that the trial court erred by requiring him to wear a stun belt during this remanded penalty-phase trial. Second, defendant argues that the trial court improperly instructed the jury on how to consider his allocution. We summarily reject the remaining assignments of error.[1] For the reasons that follow, we affirm defendant's sentences of death.

## I.   BACKGROUND

This court previously described the facts of the underlying offenses in *Guzek I*:

"The facts surrounding this vicious crime can be stated briefly. Defendant, who was 18 years old at the time of the offense, had dated a high school acquaintance during the 1986–87 school year. The high school acquaintance at the time lived with her uncle and aunt, Rod and Lois Houser, at Terrebonne, a rural community in Deschutes County. Rod Houser disapproved of defendant; Houser's niece broke off

---

[1] In February 2014, as part of this proceeding, defendant moved this court to set aside his conviction for aggravated murder and remand his case for a new guilt-phase trial. He based that motion on alleged errors in the guilt phase of the original 1988 trial. That motion has remained pending. Defendant later included those alleged errors as part of the 87 assignments of error raised in this direct review proceeding. Those assignments of error do not fall within the two categories meriting discussion and are summarily rejected. After consideration, we deny defendant's motion to set aside his convictions for aggravated murder.

the relationship. The parting was not amicable; defendant resented both the niece and her uncle.

"On Sunday, June 28, 1987, defendant met with two friends, Mark Wilson and Ross Cathey. The three men planned to burglarize a rural Deschutes County home where they believed a large amount of jewelry was kept. Defendant, who was the leader and planner in the group, instructed Cathey to cut the throat of their prospective victim with a knife that defendant supplied. Cathey agreed. That plan failed, however, when there turned out to be too many lights and too many cars at the targeted residence when the conspirators arrived.

"Thwarted, the three men started to drive back toward Redmond, the nearest town. They were continuing to look for a house to burglarize. Cathey suggested the Houser residence, which he and Wilson had remarked upon earlier that day as a possible target for a burglary. All three agreed on this alternate target.

"The three returned to the home in Redmond that defendant shared with his father. There, defendant secured two guns (a .22 rifle and a .32 pistol) to be used in robbing the Housers. The three then departed for the Housers'. On the way, they stopped at a secluded spot and defendant test fired the rifle, showing Wilson how to clear the action of the weapon if it jammed. The journey resumed.

"Somewhere during the drive it seems to have been settled that, if the Housers proved to be home when the three arrived, the couple would be killed. The Housers were at home. Defendant rang the doorbell and pounded on the door until Rod Houser finally answered it. A short, hostile discussion between defendant and Rod Houser ensued. Defendant then yelled "Do it!" to Wilson, who began firing the .22 at Rod Houser. Rod Houser retreated into the house, where he was felled by a fatal fusillade from the .22. Defendant ran upstairs and shot Lois Houser three times with the .32 pistol, killing her.

"The men then ransacked the Houser residence, taking a great deal of personal property, including a ring that defendant pulled from Lois Houser's finger after he had murdered her. The men took the property to Redmond and stored it in various locations through the help of defendant's father.

> "The Housers' bodies were discovered two days after the murders. Suspicion came to center on defendant and Wilson, due to the enmity between defendant and the Housers. Eventually, police arrested defendant, Wilson, and Cathey. Wilson and Cathey confessed, implicating defendant. Both men testified against defendant at his trial. The state permitted each to plead guilty to a reduced charge in return for his testimony."

*Guzek I*, 310 Or at 301-02 (footnote omitted). Based on those facts, the jury found defendant guilty of two counts of aggravated murder and sentenced him to death. *Id.* at 302.

On appeal from that 1988 conviction and sentence of death, defendant "raise[d] only one challenge that could be said to apply to the guilt phase of the proceedings in his case: He should have been given plea agreement opportunities equal to those given to Mark Wilson." *Id.* at 302. This court rejected that argument and affirmed the two convictions for aggravated murder. *Id.* at 302-04.

Defendant presented numerous challenges to the penalty phase as well. This court rejected most of those challenges but agreed with defendant's argument that the jury was not "given the full range of authority to consider and act on mitigating evidence that the federal Constitution requires." *Id.* at 305 (citing *State v. Wagner*, 309 Or 5, 14-20, 786 P2d 93 (1990)). As a result, this court vacated the sentences of death and remanded the case to the trial court to retry the penalty phase. *Id.* at 305-06.

That second penalty-phase trial occurred in 1991. The jury empaneled to hear the retrial reached the same result as the original jury and sentenced defendant to death. *Guzek II*, 322 Or at 250. During those proceedings, however, the trial court erred by admitting victim-impact evidence that was not relevant to any fact or proposition before the jury under the then-applicable statutory scheme. *Id.* at 270. After concluding that the error was not harmless, this court vacated the sentences of the death and remanded the case for another penalty-phase trial. *Id.* at 270-71.

The third penalty-phase trial occurred in 1997. That jury also sentenced defendant to death. *Guzek III*, 336 Or at 426. On review of that sentence, "the state concede[d]—and

[this court] agree[d]—that the trial court erred in failing to instruct the jury on the 'true-life' sentencing option," which had been statutorily created after defendant's initial trial. *Id.* This court, therefore, vacated defendant's third death sentence and remanded the case for a fourth penalty-phase trial. *Id.*

After reaching that conclusion, this court explained that, on remand, defendant could present alibi witnesses as part of the penalty-phase proceeding whose testimony was inconsistent with the alibi that he had presented during the guilt phase. *Id.* at 457-63. The court based that decision, in part, on a reading of the Eighth Amendment to the United States Constitution. *Id.* The United States Supreme Court granted the state's petition for writ of *certiorari* and, after hearing the case, held that the Eighth Amendment does not preclude a state from limiting a defendant's ability to introduce innocence-related evidence during penalty-phase proceedings. *Guzek IV*, 546 US at 526.

The United States Supreme Court remanded the case to this court, which then outlined the categories of alibi evidence that defendant could present at his fourth penalty-phase trial. *Guzek V*, 342 Or at 351-60. In July 2007, this court remanded the case to the trial court for a fourth penalty-phase trial. That penalty-phase trial was held in May and June 2010. Like the juries in the prior three penalty-phase trials, the jury in the fourth penalty-phase trial sentenced defendant to death. That fourth penalty-phase trial is the subject of the direct review now before us.

## II.   ANALYSIS

As noted above, the 13 assignments of error meriting discussion in this case concern the use of a stun belt during the penalty-phase trial and the jury instructions on allocution. We begin with the 11 assignments of error concerning the use of the stun belt.

A.   *Use of a Stun Belt During Sentencing (Assignments of Error Nos. 2-12)*

1.   *Background*

In early 2008, not long after this court remanded the case to the trial court, defendant attended a pretrial

hearing to address, among other topics, his motion to assign the case to a different judge. At that hearing, the trial court required defendant to wear visible wrist and ankle shackles attached to a chain around his waist. After that hearing, the court granted defendant's motion to assign a new judge and appointed Judge Billings to preside over the fourth penalty-phase trial.

On June 4, 2008, following Judge Billings's appointment, defendant moved to be free from *all* restraints during *all* court appearances, regardless of the nature of the restraint and regardless of whether defendant was appearing before the jury. Defendant argued that, before subjecting him to any form of physical restraint, the court must hold a hearing on whether he posed an immediate risk of danger, disruption, or escape. Defendant noted that the court had not held such a hearing and had not made any such findings. Defendant claimed that the shackles that he had worn at the prior hearing were painful and distracting, limited his ability to write or otherwise communicate with his attorneys, and, because of the media presence at the pretrial hearings, risked tainting the potential jury pool.

On June 23, 2008, the trial court sent a letter to the parties scheduling a hearing for July 31, 2008, to address pending pretrial motions. However, the court indicated that, during that hearing, it would not take up defendant's motion to be free from all restraints. Instead, the court explained that, due to defendant's prior convictions, there was no need for a hearing:

> "It will not be necessary to conduct a hearing regarding the Defendant's recent motion that he be 'free of restraints'. It is inconceivable that this Court would consider releasing this Defendant of restraints during the time he is in court. Although many cases are cited in the Defendant's memorandum, none of them are apposite. Each of those precedents involve defendants who were not yet convicted of anything. They were presumed to be innocent of all charges.

> "In this case, the Defendant is convicted of Aggravated Murder, and has no right to be presumed innocent. His best outcome in this upcoming proceedings will be to spend 9 more years in prison before he could be considered for

parole. Three separate juries have determined that he was eligible for the death penalty.

> "This Court will consider what steps may be taken to minimize the jurors' exposure to the Defendant's in-custody status. Neither evidence nor oral argument will be needed."

Accordingly, the trial court entered an order denying defendant's motion to be free from all restraints.

About a week before the July 31, 2008, pretrial hearing, defendant petitioned this court for a writ of mandamus, seeking an order requiring the trial court to hold a hearing on his motion to be free from all restraints. In the memorandum supporting his petition to this court, defendant noted that it was possible that his petition would become moot. Defendant explained that the trial court had scheduled a pretrial hearing for July 31 and that the state did not oppose defendant's request for a hearing on the issue of whether defendant should be restrained.

As defendant anticipated, on July 31, 2008, before this court took action on defendant's mandamus petition, the trial court held the scheduled pretrial hearing and considered defendant's motion to be free from all restraints. Introducing the issue, the court characterized the question before it as "whether or not this defendant would be permitted to be free in the courtroom of restraints during the time that the court would be in session." The court recognized that it previously had denied that request and told the parties that it had decided on the type of restraint that it would require. The court explained that defendant would be required to wear a stun belt, which is a device remotely controlled by an officer in the courtroom that can incapacitate the person wearing the belt through a high-voltage electrical charge. The court reasoned that it did not want to impede defendant's ability to counsel with his attorneys and that, unlike the visible wrist and ankle shackles that defendant had worn at the previous hearing, the stun belt would be concealed and allow defendant to write and lean over to communicate with counsel. The court disclosed that it had spoken with representatives from the Oregon Department of Corrections and the Deschutes County Sheriff's Office earlier that day and that those persons

found the plan "acceptable." The court also indicated that officers in the courtroom would be allowed to carry side arms and Tasers.

After outlining its security plan, the court asked defendant for comment. Defendant began by arguing that he was entitled to a hearing on whether restraints of any type were necessary. Defendant referred to the court's earlier letter denying his motion to be free of restraints and argued that the court had erred in its conclusion that the right to be free of restraint did not apply after a defendant had been convicted. In support of that argument, defendant cited *Deck v. Missouri*, 544 US 622, 125 S Ct 2007, 161 L Ed 2d 953 (2005), in which the United States Supreme Court recognized that the federal right to be free of unnecessary restraints continues to apply even after guilt has been established. The trial court responded by noting that, unlike the defendant in *Deck*, who had worn shackles, defendant in this case "would be clothed in such a way that the stun belt would be under his clothing."

Defendant then changed the focus of his argument, asserting that he needed a hearing to establish the potential prejudicial effects that would occur if he were required to wear a stun belt. Defendant told the court that, if allowed to present testimony on the issue, he would present two types of testimony: (1) his own testimony about how he had been affected when he was required to wear a stun belt during his third penalty-phase trial and (2) testimony about the prejudicial effects of a stun belt more generally—namely, that stun belts can interfere with a defendant's ability to participate in his or her defense, can affect a defendant "psychologically," and can inhibit a defendant's right to testify because a defendant may be concerned about the stun belt "going off" accidentally.

As to his own experience, defendant asserted that he would testify that, at his earlier trial, he did not think that he could get up to tap defense counsel on the shoulder or raise his hand to get counsel's attention during the proceedings. The court responded by asking, "Would [defendant] be able to lean over to [co-counsel] Mr. Rader and say, 'Mr. Rader, would you let [defense counsel] Mr. Mallon

know I have something to tell him,' would that be possible?" Defendant confirmed that "[i]t would be possible." As to the prejudicial effects of wearing a stun belt more generally, defendant asserted that he would call a medical doctor who would testify that wearing a stun belt is "medically not advisable" and could have an emotional and mental impact that would interfere with a defendant's concentration.

Defendant then returned to the subject of "why any restraints are necessary at all" and argued that the court's refusal to hold an evidentiary hearing had denied the state an opportunity to make the necessary record on that issue. However, defendant summed up, "[W]e don't care so much about that."

At that point, the state asked to be heard. The state agreed with defendant that defendant should be able to communicate with his attorneys. However, the state contended, defendant had been sentenced to death for capital murder and presented a security risk. The state argued that

> "[defendant's] guilt [has] not been overturned. [Defendant] has been convicted of two counts of capital murder; three times sentenced to death, and there are legitimate security issues for the Court, for myself, for the victims, for the witnesses, for everybody else. We're in a pretty small courtroom."

The state also informed the court that, as defendant had noted, a stun belt had been used in the third penalty-phase trial in 1997. The state took the position that no prejudice had occurred and that a stun belt would be less restrictive than the leg brace that had been used in the second penalty-phase trial in 1991. The state argued that, when wearing a stun belt in the current trial, defendant's hands and feet would be unrestrained and the jury would never see or know about the stun belt unless defendant made an effort to show it to them. In contrast, the state represented, the leg brace used in 1991 had been "such a problem that we had to drape the entire area for fear that perhaps the brace might click or in some way *** show that the defendant was in restraints."

Defendant did not object to the state's characterization of the security risks that defendant posed or the comparative advantages and disadvantages of the two types of

restraints that the court had ordered in the past. Defendant did not argue that either type of restraint was preferable, nor did he suggest that the court impose an entirely different type of restraint.

After the July 31, 2008, hearing, the court entered the following order affirming its denial of defendant's motion to be free of all restraints, requiring that defendant wear a stun belt, and confirming the court's understanding that defendant's hands would be free to communicate with counsel:

> "THIS MATTER CAME BEFORE THE COURT for hearing on July 31, 2008, upon various pre-trial motions filed by Defendant, and other matters. \*\*\* Each party having been given the right to be heard[.] \*\*\* The court has received the objections to this Order presented by the defense and those objections are noted. However, [with one exception not relevant here], the Court is adhering to the determinations made in court on July 31, 2008.

> "USE OF RESTRAINTS IN THE COURTROOM.

> "Defendant has previously filed Motion No. 11, asking that he be free of restraints while in the courtroom. The Court has previously denied that motion, on June 23, 2008, and that ruling is affirmed. A letter which further reflects the Court's opinion, dated June 23, 2008, is attached hereto as Exhibit A.

> "The Court advised counsel that after consultation with Captain Jenkins of the Deschutes County Sheriff's Office, and with officials with the Department of Corrections, that it will be sufficient that the Defendant be restrained in the courtroom with the application of a stun belt. In addition, the Court has authorized that officers present in the courtroom be armed with tasers and side arms, to the extent they deem necessary. It is understood that Defendant's hands shall be free to communicate with counsel."

After the trial court issued that order, defendant filed a second mandamus petition with this court, seeking an order requiring the trial court to hold an evidentiary hearing "about stun belts in general, and in particular as a stun belt would affect [defendant]." In his second petition for mandamus, defendant explained why he had not offered evidence in the trial court attempting to establish that he

presented no risk of danger, disruption, or escape justifying
restraint:

> "To perhaps state the obvious, [defendant] does not object
> to being restrained during trial, so long as the restraints
> are not visible to the jury, and so long as a stun belt is
> not used. Hypothetically, he may be entitled to a hearing
> on even this point, but he concedes that the nature of his
> conviction and the potential for a death sentence permit
> non-visible conventional shackles. Defense counsel told the
> court, '[the prosecutor] has to make a record of why any
> restraints are necessary at all, and you're denying that as
> well, although we don't care so much about that.'"

This court denied both of defendant's mandamus petitions
in November 2008.

Thereafter, defendant filed two trial court motions
seeking an evidentiary hearing on the stun belt issue: one in
December 2009 and one at the end of April 2010, just days
before the start of trial, which began on May 5, 2010. The
trial court denied those motions respectively in March and
May 2010. Defendant also submitted three offers of proof.
Defendant filed the first offer of proof with the April 2010
motion and the other two offers of proof during trial. The
trial court took no action on those offers of proof.

On automatic review in this court, defendant argues
that the trial court's rulings on the issue of restraints vio-
lated defendant's state and federal constitutional rights—
namely, his rights under Article I, section 11, of the Oregon
Constitution[2] and his rights under the Sixth and Fourteenth
Amendments to the United States Constitution.[3] Defendant
argues that the trial court made both procedural and sub-
stantive errors by (1) failing to provide defendant with a suf-
ficient evidentiary hearing; (2) insufficiently documenting

---

[2] Article I, section 11, of the Oregon Constitution, provides, "In all criminal prosecutions, the accused shall have the right to *** an impartial jury in the county in which the offense shall have been committed; to be heard by himself and counsel."

[3] The Sixth Amendment provides, "In all criminal prosecutions, the accused shall enjoy the right *** an impartial jury of the State and district wherein the crime shall have been committed *** and to have the Assistance of Counsel for his defence [*sic*]." Section 1 of the Fourteenth Amendment contains the portion relevant here, stating, "[N]or shall any State deprive any person of life, liberty, or property, without due process of law."

its reasoning and factual findings; and (3) requiring that defendant wear a stun belt during the trial. We address each of defendant's arguments in turn, beginning with his arguments based on state law. *See State v. Babson*, 355 Or 383, 432-33, 326 P3d 559 (2014) (stating reasons for considering questions of state law first).

    2.   *State law*

       a.  Sufficiency of the hearing

As a matter of state law, "'[t]his court long has recognized the right of a criminal defendant to appear free of physical restraints during a jury trial.'" *State v. Washington*, 355 Or 612, 627, 330 P3d 596 (2014), *cert den*, 135 S Ct 685 (2014) (quoting *State v. Bowen*, 340 Or 487, 495, 135 P3d 272 (2006)). That right stems from an "ancient rule of the common law," *State v. Smith*, 11 Or 205, 208, 8 P 343 (1883), that is now "grounded in Article I, section 11, of the Oregon Constitution." *Washington*, 355 Or at 628.

Nevertheless, we have not previously considered whether that right against unnecessary restraint applies to a penalty-phase proceeding, at which time guilt has been established. We have, however, previously applied Article I, section 11, to penalty-phase proceedings to protect other trial rights. *See, e.g.*, *DeAngelo v. Schiedler*, 306 Or 91, 94, 757 P2d 1355 (1988) (holding that, for the purposes of Article I, section 11, a "criminal prosecution" includes "an ordinary sentencing hearing"); *see also State v. Rogers*, 352 Or 510, 542-43, 288 P3d 544 (2012) (holding that the trial court violated Article I, section 11, by impaneling an anonymous penalty-phase jury without sufficient justification). The state does not argue that the right against unnecessary restraint applies only to guilt-phase proceedings, and we conclude that Article I, section 11, of the Oregon Constitution protects that right during both the guilt and penalty phases of a criminal trial.

However, the right to appear free of physical restraints before a jury is not absolute. A trial court may require that a defendant be physically restrained in front of the jury, but a trial court can do so only "[a]fter hearing relevant evidence from the state and the defendant" on

whether the defendant's risk of danger, disruption, or escape justify the restraint. *Washington*, 355 Or at 628. And "[s]uch evidence should be placed on the record in a hearing for that purpose." *Id.* Defendant argues that the trial court failed to meet that standard, because the court denied defendant's repeated requests for an evidentiary hearing during which he could offer live testimony from witnesses not only about whether he presented a security risk justifying some sort of restraint but also about the appropriate type of restraint.

Defendant begins by arguing that the trial court erred when, in its June 2008 letter, the court indicated that there was no need for a hearing on defendant's motion to be "free of restraints," stated the basis for its decision to impose restraints, and denied defendant's motion. The trial court's summary disposition of the matter is indeed troubling, and defendant would have a fair point if the trial court's June 2008 letter were its only ruling on that issue. However, on July 31, 2008, the court held a pretrial hearing at which the parties, in fact, had an opportunity to be heard on the question of "whether or not this defendant would be allowed to be free in the courtroom of restraints during the time that the court would be in session." At that hearing, the court referred to its prior letter stating why it deemed defendant to be a security risk and then outlined its plan to require defendant to wear a stun belt, explaining that law enforcement personnel assigned to the courtroom had found the plan to be "acceptable." The court then asked for comment and, in effect, conducted a pretrial hearing on the dual issues of whether defendant should be restrained and what type of restraint was appropriate.

Defendant does not dispute that he had an opportunity to be heard on those issues. The trial court held a hearing on those issues on July 31, 2008. Instead, defendant contends that the trial court's hearing was insufficient to meet constitutional requirements, because he was not afforded a hearing at which he could call witnesses or present evidence.

As we explained in *Washington,* 355 Or at 628, a trial court may impose restraints only "[a]fter hearing relevant evidence" on a defendant's risk of danger, disruption, or escape. There are, however, various ways in which parties

may present evidence to a court, and we have never held that Article I, section 11, requires that a court allow parties to present live witnesses in every case.[4] Whether an evidentiary hearing involving live testimony is required depends on the particular circumstances of each case, including the nature of the issues presented and the extent to which the parties' arguments rest on disputed facts that may be informed by witness testimony. For instance, a court may not be required to hear testimony in support of undisputed facts, undisputed representations of counsel, or facts that, even if true, would not change the trial court's legal decision.

As a result, we review the trial court's decision denying defendant's request for an evidentiary hearing involving live testimony to determine whether live testimony was needed to resolve factual disputes relevant to the court's decision to impose restraints. And we review that decision based on the record that was before the trial court at the time of the decision. *See State v. Pitt*, 352 Or 566, 575, 293 P3d 1002 (2012) ("[I]n the usual case, we will evaluate a claim of pretrial error on the basis of the same record that the trial court relied on in making the challenged ruling.").

In this case, the trial court denied defendant's request for a live evidentiary hearing in July 2008 and again in March and May 2010. In July 2008, on the issue of whether defendant posed any security risk justifying restraint, the trial court considered the uncontested facts that defendant had been convicted of two counts of capital murder and three times sentenced to death as well as the

---

[4] Other courts have held that live testimony is not always required. *See, e.g.*, *State v. Wall*, 252 Or App 435, 439, 287 P3d 1250 (2012), *rev den,* 353 Or 280 (2013) ("The information need not be presented in a formal adversarial proceeding, but it must provide a basis for the trial court to make an independent assessment of the risk."); *State v. Kessler*, 57 Or App 469, 473, 645 P2d 1070 (1982) ("The information utilized need not come in a formal adversary proceeding."); *People v. Lomax*, 49 Cal 4th 530, 561, 234 P3d 377, 404 (2010) ("[W]e have held that a formal hearing is not required, so long as the court makes its own determination about the need for restraints based on facts shown to it, and does not simply defer to the recommendation of law enforcement."); *People v. Buchanan*, 13 NY3d 1, 4, 912 NE2d 553, 555 (2009) ("A formal hearing may not be necessary, but the trial court must conduct a sufficient inquiry to satisfy itself of the facts that warrant the restraint."); *State v. Kunze*, 2007 ND 143, ¶ 20, 738 NW2d 472, 478 (2007) ("The district court is not required to conduct an evidentiary hearing in every case.").

state's representations that defendant had been restrained
for security purposes in at least two prior trials, that the
courtroom was small, and that the trial presented legitimate
security issues for the court, the prosecutor, the victims, and
the witnesses. Defendant did not counter those facts or rep-
resentations or offer to prove additional facts, such as facts
indicating that—even if he had been dangerous at the time
of the murders or the previous trials—he was no longer a
danger. Rather than asserting that a live evidentiary hear-
ing was required to demonstrate that he did not present
a security risk, defendant argued only that the state had
failed to justify the use of restraints, adding that "we don't
care so much about that." Thus, the parties' arguments did
not rest on disputed facts, and the trial court did not err by
deciding that there was no need for a live evidentiary hear-
ing on the issue of whether to impose restraints.

The trial court also did not err by denying defen-
dant a live evidentiary hearing on the type of restraints to
impose. The court was aware that defendant previously had
been required to wear both shackles and a stun belt. In his
June 2008 motion to be free of all restraints, defendant had
taken the position that the shackles he had been required to
wear at a pretrial hearing had caused him pain and inter-
fered with his ability to confer with counsel. The state rep-
resented that defendant had worn a stun belt during a pre-
vious trial without evident prejudice and that a stun belt
was preferable to leg shackles when measured by its effect
on communications with defense counsel and the risk of jury
exposure.

Defendant did not directly respond to the state's
representations. Instead, he took the position that stun belts
are generally prejudicial because they make defendants
fearful and limit their ability to communicate with coun-
sel. Defendant also asserted that, during the 1997 penalty-
phase trial when he had worn a stun belt, he had felt limited
in his ability to get counsel's attention during trial court
proceedings.

The record indicates that, although the trial court
decided to require defendant to wear a stun belt, the court
considered and credited the facts that defendant presented

about the risks that stun belts pose. For instance, with respect to defendant's specific concerns about communicating with counsel, the court obtained defendant's assurance that, even while wearing the stun belt, he could get the attention of co-counsel sitting next to him, who could get the attention of lead counsel during the trial proceedings. Although the court did not specifically address the evidence that defendant claimed that he could proffer on the psychological effects of a stun belt, neither the state nor the court suggested disagreement with that evidence or indicated doubts about its veracity. Instead, the court acknowledged the facts that defendant said he would adduce through live witnesses. Although the court did not find those facts persuasive, it did not err in making its decision without hearing directly from the witnesses that defendant proffered.

Defendant's further contention that he was entitled to question the law enforcement personnel with whom the court had spoken is also without merit. Although those communications had occurred off the record, the trial court placed them on the record at the July 2008 hearing and indicated that law enforcement personnel had found his plan to use a stun belt to be an acceptable form of restraint.[5] At that time, defendant expressed no need or desire to examine the law enforcement personnel and gave the trial court no reason to believe that their communications raised a contested

---

[5] Defendant also argues that, in deciding to impose restraints and in deciding what types of restraints to require, the court delegated its authority to law enforcement personnel or relied on an erroneous legal conclusion—namely, that a defendant has no right to be unrestrained during a penalty-phase trial. We disagree. The record indicates that the court made its own decision to require a stun belt and based that decision on its consideration of the facts as well as the law.

Defendant notes that, at a hearing on August 3, 2009, more than a year after the court made its decision to require a stun belt, a question arose about whether the stun belt requirement would again be discussed. The trial court stated, "I've taken the position everywhere I've ever sat that the conditions requested by the agency that is holding the defendant are what I'm going to do. And I think it's going to be—he's going to be turned over to Deschutes County, and that's what they said they wanted, so that's what I said they were going to get." That statement does not change the fact that the trial court held a hearing in July 2008, considered the parties' arguments and evidence at that hearing, and identified on the record at that time the role that law enforcement personnel played. As a result, the trial court's August 2009 statement does not indicate that the court failed to exercise its discretion in July 2008 or failed to consider the arguments and evidence of the parties.

issue of fact.[6] The trial court did not err in denying defendant's request for a live evidentiary hearing in July 2008.

Nor did the trial court err in denying defendant's motions for a live evidentiary hearing in March and May 2010. In making those later motions, defendant did not present new reasons for requesting the presence of live witnesses; instead, defendant reasserted his previous arguments and more fully developed the factual record that he had summarized in his argument to the court at the July 2008 hearing. Defendant's motions, in effect, sought reconsideration of the court's July 2008 order. In determining whether to reconsider its earlier rulings, a trial court has broad discretion, and defendant does not persuade us that the trial court abused its discretion in denying reconsideration in this case. *See State v. Herrin*, 323 Or 188, 197, 915 P2d 953 (1996) (concluding that a trial court did not abuse its discretion by refusing to reconsider prior evidentiary ruling based on a new legal argument); *see also State v. Rogers*, 330 Or 282, 300-01, 4 P3d 1261 (2000) (stating that a trial court "generally possesses broad discretion to control the proceedings before it," including the "discretion to ensure that the trial is orderly and expeditious").

        b.    Sufficiency of the trial court's findings

Defendant next argues that the trial court failed to make a sufficient record. Previously we have held that a trial court must "make a record of its factual findings and reasoning in support of its order" requiring a defendant to wear a stun belt. *Washington*, 355 Or at 628. The purpose of those findings is to facilitate appellate review. *Id.* That

---

[6] Defendant eventually asked to examine the law enforcement personnel, but that request came too late. The trial court had made its decision to require a stun belt and not to take live testimony on that issue in July 2008. Defendant did not ask to examine the law enforcement personnel until December 2009, nearly a year and half after the communications at issue.

In his reply brief, defendant argues extensively that the trial court's communications with law enforcement personnel constituted improper *ex parte* communications justifying reversal. To the extent that those arguments are separate from defendant's arguments on his procedural rights to a hearing, defendant failed to preserve them. *See* ORAP 5.45(6) ("Each assignment of error shall be followed by the argument."); *see also Strawn v. Farmers Ins. Co.*, 350 Or 336, 369 n 23, 258 P3d 1199, *adh'd to on recons*, 350 Or 521, 256 P3d 100 (2011) ("[A]dvancing such a new and different argument for the first time in a reply brief is not the proper way to preserve an argument in the Court of Appeals.").

review is better facilitated by a record of findings that is direct, express, and clearly delineated. *See, e.g.*, *id.* at 629-30 (describing a trial court's extensive findings on need for restraint). Nevertheless, the standard for determining error in the sufficiency of the judicial record is a functional one— namely, whether the record reveals the findings and reasoning for the court's actions. *See, e.g.*, *[McCarthy v. Oregon Freeze Dry, Inc.](link)*, 327 Or 185, 187, 957 P2d 1200 (1998) (in the context of a trial court's discretion to award attorney fees, stating that "the requirement of explanatory findings stems *** from prudential and practical considerations that undergird the interests of the parties and the court in meaningful appellate review").

Here, the court's factual findings and reasoning are apparent from the record. In its June 2008 letter, the trial court found that defendant presented a security risk, and, at the July 2008 hearing, the trial court reaffirmed that finding and outlined its plan to have defendant wear a stun belt to address that risk. As part of its reasoning, the court stated that, unlike the shackles that defendant had worn at a previous hearing, the stun belt would be positioned under defendant's clothes and would not be visible to the jury or the media. The court also reasoned, and defendant confirmed, that defendant would be able to communicate with lead counsel because he would be sitting beside co-counsel who could get the attention of lead counsel if needed and because defendant also could write and take notes to share with both counsel. The court was not persuaded that defendant's objections about the generalized risk of accidental activation and the fear that that risk could engender justified prohibiting use of the stun belt.[7] Those findings and that reasoning are sufficient to permit appellate review of the trial court's decisions.

    c.   Sufficiency of facts supporting the order

Defendant next argues that, even if the trial court complied with the procedural requirements that it hold a hearing, make factual findings, and explain its reasoning,

---

[7] Defendant did not argue that the officer operating the stun belt was unqualified to do so or that there was a substantial risk that the stun belt itself would malfunction.

those findings and that reasoning were substantively insufficient to justify the court's order that defendant be restrained and be required to wear a stun belt. First, defendant asserts that the record lacks evidence that he posed a substantial risk of danger, disruption, or escape. Defendant is incorrect. The trial court reasonably inferred a risk of danger, disruption, or escape from the conduct that resulted in defendant's convictions for aggravated murder and the state's representations about the size of the courtroom and the concerns of trial participants. Defendant presented no argument or evidence to the trial court to refute the existence of that risk. In his second petition for mandamus to this court, defendant conceded "that the nature of his conviction and the potential for a death sentence permit non-visible conventional shackles."

Defendant's second assertion is that there was insufficient evidence of danger to require that he be subjected to a particular type of restraint—a stun belt. Whether a particular type of restraint is justified depends on the risk of prejudice that the restraint presents and the risk of danger, disruption, or escape that the defendant poses. Evidence that justifies one type of restraint may not justify another type of restraint, particularly if those restraints present a markedly different risk of prejudice. A decision about which type of restraint to impose requires an exercise of discretion, and, to appropriately exercise its discretion, a court may be required to weigh the available alternatives presented by the parties. The trial court's choice of restraints must be supported by evidence in the record. *Washington*, 355 Or at 628-29.

In this case, there was evidence that each of the potential restraints that the trial court considered posed a risk of prejudice. Defendant presented evidence that a stun belt carries risks of psychological prejudice; both parties also presented evidence of the risk of prejudice that shackles pose. The state presented evidence that it had been difficult to ensure that leg shackles would not be visible, and defendant presented evidence that shackles were painful and had inhibited his ability to confer with counsel. There was also evidence that the use of a stun belt would eliminate some of those risks because it would be more easily concealed and would permit defendant to confer with counsel.

The trial court weighed the relative prejudice of each type of restraint, and we cannot say that the evidence was insufficient to justify the trial court's decision.[8]

Based on the foregoing, we affirm the trial court's exercise of discretion ordering defendant to wear a stun belt during the penalty-phase trial under Article 1, section 11, of the Oregon Constitution.[9]

### 3. *Federal law*

Defendant's arguments under federal law substantially overlap with his arguments under state law. Defendant argues that, under the United States Supreme Court decision *Deck*, he was entitled to an evidentiary hearing with the opportunity to call witnesses on the need for restraints and that the state did not meet its burden to prove the need for restraints.

In *Deck,* the trial court had required that the defendant wear visible shackles during his penalty-phase trial. On review, the Supreme Court, like this court, recognized that the rule prohibiting routine shackling "has deep roots

---

[8] Our conclusion is based on the specific facts and arguments presented to the trial court in this case. We do not intend, in this case, to define the boundaries of a trial court's discretion to require a stun belt or hold that a court would be justified to require a stun belt in all cases in which a defendant was convicted of aggravated murder. The risk of prejudice posed by the use of a stun belt is not trivial and must be considered on an individualized basis. For example, in *United States v. Durham*, 287 F3d 1297 (11th Cir 2002), a federal court of appeals found error with a trial court's decision to require a stun belt where the record established that "most stun belt models were designed to administer from 50,000-70,000 volts of electricity sustained over an eight-second period" and that such a charge may cause "the recipient to lose control of his limbs, to fall to the ground, and often to defecate or urinate upon himself'." *Id.* at 1301. On remand, the trial court made express findings putting those facts in context, explaining that "the wearer is immobilized without any electrical effect upon his heart or internal organs" and that "[n]umerous tests have shown that a stun belt does not cause either short-term or long-term injury to the wearer." *United States v. Durham*, 219 F Supp 2d 1234, 1238 (ND Fla 2002). Despite that more favorable record, the trial court still made individualized findings on prejudice, noting that "[t]he Marshal's Service has reviewed the defendant's medical records and determined that the stun belt does not pose any health risk to him." *Id.* at 1238-39.

[9] After oral argument, the state filed a motion to strike parts of defendant's reply brief that included a factual record developed after the trial court's relevant rulings. Defendant offered that record to refute the state's contention that any error with regard to the stun belt was harmless error. Because we reject defendant's argument that there was error, we do not reach the question of harmless error. As a result, we deny the state's motion as moot.

in the common law." *Deck*, 544 US at 626. The Court identified three interests protected by that rule: the jury's fact-finding function; the defendant's right to participate in his or her own defense; and the dignity of the judicial process. *Id.* at 631. Because of the importance and longstanding nature of that rule, the Supreme Court declared that the right to remain free of physical restraints that are visible to the jury is a right that is "a basic element of the 'due process of law' protected by the Federal Constitution." *Id.*

The Court explained, however, that that right is not absolute. A trial court may, in the exercise of its discretion, require restraints when they are justified by a state interest specific to a particular trial:

> "[T]he Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial. Such a determination may of course take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial."

*Id.* at 622.

The problem that the Supreme Court identified in reviewing the trial court's decision in *Deck* was that the trial court had determined, based solely on the jury's finding that the defendant was guilty of the charged crime, that defendant no longer had a right against unnecessary restraints. *Id.* at 634. Because the trial court had based its ruling on a misunderstanding of the law and not on an exercise of discretion, the Supreme Court reversed the jury's imposition of the death sentence. *Id.*

In this case, defendant argues that *Deck* entitles him to call witnesses on the issue of whether the trial court may impose restraints. Defendant also contends that, like the trial court in *Deck*, the trial court in this case committed reversible error when it decided that defendant must be restrained based solely on the fact that the jury had convicted him of the charged crime.

*Deck* does not require reversal in this case. First, *Deck* does not address the type of hearing that a court must conduct before ordering restraints. In *Deck,* the error that the Court identified was the trial court's failure to exercise its discretion, not its failure to hold a formal evidentiary hearing. *Id.* Second, in this case, the trial court exercised the discretion that was missing in *Deck*. The trial court did not decide that defendant had no right against unnecessary restraint. Rather, the court determined that safety concerns permitted it to impose nonvisible restraints. Consistent with our holding applying state law, we conclude that the trial court in this case operated within its discretion under federal law when it ordered defendant to wear a stun belt during the penalty-phase trial.[10]

B.   *Jury Instructions on Allocution (Assignments of Error Nos. 14-15)*

   1.   *Background*

      Defendant also assigns error to the instructions that the trial court gave to the jury regarding defendant's allocution. An allocution is a defendant's opportunity to be heard after the defendant has been found guilty but before the penalty is determined. *Rogers*, 330 Or at 296. In this case, defendant presented an allocution, but, he contends, the trial court erred in instructing the jury about its effect. Defendant argues that the trial court erred both by refusing to give defendant's proposed preliminary instruction on allocution and by giving the state's instructions on allocution at the conclusion of the trial. Both of those errors, defendant asserts, precluded the jury from considering the allocution in determining defendant's sentence. The state responds that defendant mischaracterizes the trial court's instructions as a whole and that the court was correct in

_____

[10] Defendant's Assignments of Error Nos. 2 to 12 all relate to use of the stun belt at trial. Assignments of Error Nos. 2 to 6 are resolved above. Assignments of Error Nos. 7 to 12 are premised on defendant's claim that use of the stun belt was unjustified. Because we reject that argument, we also reject defendant's Assignments of Error Nos. 7 to 12.

   In Assignment of Error No. 13, defendant argues that use of a stun belt violated the federal Supremacy Clause, Article VI, clause 2, of the United States Constitution, because use of the stun belt violates international treaties signed by the federal government. We summarily reject that argument.

refusing to give defendant's preliminary instruction and in giving the state's proposed final instructions. For the reasons that follow, we agree with the state.

Shortly before the remanded penalty-phase trial, defendant proposed that the trial court give the jury a preliminary instruction that stated:

> "Your duty is to decide the facts from the evidence. You, and you alone, are the judges of the facts. You will hear the evidence, decide the facts, and then apply those facts to the law I give you. That is how you will reach your verdict. * * *

> "The *material* you are to *consider* in this case consists of testimony of the witnesses, exhibits received in evidence, *mitigating data and the defendant's allocution.* Exhibits are physical things such as letters, photographs, charts, or physical objects. You will be able to examine the exhibits while you deliberate. You may draw any reasonable inferences from the evidence, but you must not engage in guess work."

(Emphasis added.) The trial court gave a modified version of that instruction that deleted a reference to defendant's allocution. At the state's request, the trial court instead instructed the jury: "The *evidence* you are to consider in this case consists of testimony of witnesses * * * and exhibits that are received in evidence." (Emphasis added.)

In deciding to give that modified instruction, the trial court not only rejected defendant's request that it instruct the jury that it was entitled to consider defendant's allocution, but it also rejected a separate request from the state to inform the jury that a defendant's allocution is an unsworn statement and is not evidence. In objecting to the state's request, defendant conceded that, as a "hypertechnical matter[,] the [proposed instruction] is correct that an allocution is not evidence." But, nevertheless, defendant argued that the state's instruction would tend to confuse the jury. The trial court responded by eliminating all references to allocution in the preliminary instructions.

Following the preliminary jury instructions, the parties presented their respective cases to the jury. Then, before defendant's allocution and the parties' closing arguments, the trial court heard arguments from the parties on

the final jury instructions. The parties again disagreed over how to characterize the allocution. The state renewed its request to instruct the jury that the allocution is unsworn and is not evidence. This time, over defendant's objection, the trial court agreed with the state. The trial court's final jury instructions informed the jury that defendant's allocution was not evidence but could be considered in reaching the verdict:

> "As a defendant, Mr. Guzek has a right to make an unsworn statement. It is *not evidence but it may be considered by you* in answering the questions on the verdict forms. Neither party may comment on the Defendant's allocution."

(Emphasis added.)

With respect to the fourth question that appeared on the verdict form, required by ORS 163.150(1)(b), the trial court also instructed the jury to base its decision on the evidence:

> "The fourth question in this verdict is 'shall a death sentence be imposed?' The burden of proof beyond a reasonable doubt does not apply to this question. Regarding this question, neither side bears any burden of proof. This question calls for a discretionary determination to be made by each of you *based on the evidence*. * * *

> "Any one of you has the power and discretion to choose life imprisonment with the possibility of parole or release as the appropriate sentence. You must answer this question 'no' if, *after considering any mitigating evidence* concerning any aspect of the Defendant's character or background or any circumstance of the offense and any impact evidence relating to the personal characteristics of the victims or the impact of the crime on the victim's family, one or more of you believe that the Defendant should not receive a death sentence."

(Emphasis added.) The trial court gave similar instructions with regard to both counts of aggravated murder.

Immediately following the final jury instructions, defendant read his allocution, which expressed his regret over the loss suffered by the family of the victims and sympathized with the family for the fact that they were participating in a fourth penalty-phase trial. Although defendant

stated that he was "truly sorry for all the unnecessary pain" that he caused and that he "failed Rod and Lois Houser and the Houser family," he did not address the crime itself or his role in the crime. When directing his comments to the jury, defendant blamed himself for his "failures" and left the choice of life or death to the jury:

> "And it is for that reason that I'm not standing before you, at this moment, asking for you to spare my life, nor am I asking you to sentence me to death. You've heard a tremendous amount of evidence in this case, and I will respect whatever decision you either individually and/or collectively agree upon."

After defendant's allocution, counsel presented their closing arguments and the jury deliberated. Ultimately, the jury returned a verdict sentencing defendant to death.

2.   *Defendant's requested preliminary instruction*

Defendant asserts that the trial court erred by refusing to give his proffered preliminary instruction informing the jury that it could "consider" his allocution.[11] But defendant fails to address the fact that the trial court gave precisely that instruction at the close of the evidence. There is no error in refusing to give a proffered instruction "if the substance of the proffered instruction, even if correct, was covered fully by the trial court's other instructions." *State v. Barnes*, 329 Or 327, 334, 986 P2d 1160 (1999); *see also United States v. Whittemore*, 776 F3d 1074, 1078 (9th Cir 2015) (stating that failing to give a proffered instruction is error only when the defendant can show, among other things, "that the given instructions did not adequately encompass his theory").

In this case, the trial court covered the substance of defendant's proffered instruction in its final jury instructions when it informed the jury that defendant's allocution "is not evidence but it may be considered by you in answering the questions on the verdict forms." Because the substance of defendant's proffered instruction was fully covered

---

[11] Defendant's proposed instruction also referred to "mitigation data." However, defendant does not explain what that term refers to or how it should be understood as separate from the "evidence," as defined by the instructions.

by the trial court's later instructions, the trial court did not err by refusing to give defendant's proffered preliminary instruction.

### 3. *Final instructions*

Defendant further argues that the trial court violated Article I, section 11, of the Oregon Constitution and the Eighth and Fourteenth Amendments to the United States Constitution by giving the jury incorrect final instructions. We again begin with defendant's arguments under state law. *Babson*, 355 Or at 432-33.

#### a. State law

Based on a request by the state, and over defendant's objection, the trial court instructed the jury that defendant's allocution was unsworn and not evidence but that it nevertheless could be considered when answering the questions on the verdict form. Defendant does not argue that the allocution was sworn or was evidence. Instead, defendant argues that the trial court erred by instructing the jury that the allocution is not evidence and *then* instructing the jury that its answers to the fourth verdict question must be "based on the evidence" given and "after considering any mitigating evidence." According to defendant, those instructions, read together, erroneously precluded the jury from considering defendant's allocution.

The accuracy of the trial court's instructions is a question of law. *State v. Moore*, 324 Or 396, 427, 927 P2d 1073 (1996). We review the instructions as a whole in determining whether a trial court erred by giving a particular instruction and whether the instruction accurately stated the law. *State v. Serrano*, 355 Or 172, 187, 324 P3d 1274 (2014), *cert den,* ___ US ___, 135 S Ct 2861 ___ L Ed 2d ___ (2015).

Assessing the accuracy of the trial court's instructions requires us to determine whether a jury can both base its decision to impose the death penalty on the evidence and still consider, and give effect to, a defendant's allocution, which is not evidence. Thus, we must assess the purpose that the right of allocution serves. Article I, section 11, of the Oregon Constitution states that, "[i]n all criminal

prosecutions, the accused shall have the right \*\*\* to be heard by himself." That provision "encompasses the right of all criminal defendants to allocution, which 'refers to a convicted defendant's opportunity to speak before sentencing[.]'" *Rogers*, 330 Or at 296 (quoting *DeAngelo,* 306 Or at 93 n 1).

Before Oregon adopted Article I, section 11, state law prohibited criminal defendants from testifying under oath in their defense. But "after a jury had returned a verdict of guilty against a defendant, courts would inquire whether the defendant knew of any reason why the court should not pronounce judgment. The courts allowed criminal defendants to make a responsive statement and labeled this process 'allocution.'" *Id.* at 299. The purpose of the allocution was "'to provide the defendant an opportunity to plead for mitigation of the sentence,'" *id.* at 306 (quotation omitted), "to convince the sentencing authority to impose no more than the minimum sentence[,] and \*\*\* to address other matters pertaining to the sentence," *id.* at 305. As a result, a defendant's allocution could address "legal reasons why the court should not impose a potential sentence, general pleas for leniency, mitigating factors, and requests for pardon." *Id.* Although the permissible scope of a common-law allocution was therefore broad, it was often of little effect; common-law courts had little discretion in sentencing. *State v. Ferman-Velasco*, 333 Or 422, 435, 41 P3d 404 (2002). Instead, common-law courts considered the allocution only for "'strictly defined legal reasons which required the avoidance or delay of sentencing: he was not the person convicted, he had benefit of clergy or a pardon, he was insane, or if a woman, she was pregnant.'" *Id.* (quotation omitted).

Today, criminal trial practice and sentencing schemes are different than they were at common law. If a defendant has personal knowledge of facts for the jury to consider, the defendant may take the stand, testify as a witness to those facts, and have them considered by the jury along with the other evidence in the case. Also, defendants have a right to be represented by attorneys who may assert legal reasons why the court may not impose a particular sentence. Thus, an allocution is no longer necessary for a

defendant to raise legal defenses or present his or her own version of the facts.

However, the right to allocution continues to serve its historic function of providing defendants with the opportunity to seek mitigation. Because modern sentencing schemes often grant sentencing discretion that was largely unknown at common law, an allocution that presents a compelling plea for leniency may have a greater impact on a defendant's sentence today than it had at common law. And it is still true that a defendant's personal plea may carry more weight than a plea from counsel. As the United States Supreme Court recognized in *Green v. United States*, 365 US 301, 81 S Ct 653, 655, 5 L Ed 2d 670 (1961):

> None of these modern [legal] innovations lessens the need for the defendant, personally, to have the opportunity to present to the court his plea in mitigation. The most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself.

*Id.* at 304.

Given the continuing importance of the right to allocution, it is apparent that, in this case, the trial court correctly instructed the jury that it could consider the allocution when making its decisions about whether to impose the death sentence. The question is whether the trial court erred when it also instructed the jury to decide the fourth question "based on the evidence" and "after considering any mitigating evidence." Defendant contends that the instructions thereby precluded the jury from considering the allocution in deciding whether defendant should receive a death sentence.[12]

We disagree. The court's instruction that the answer to the fourth question must be "based on the evidence" and "after considering any mitigating evidence" is a correct statement of law. *See Washington*, 355 Or at 654 (explaining that certain jury instructions were improper if they

---

[12] Defendant asserts that argument with regard to all four statutory questions on the verdict form. But the trial court's instructions with regard to the first three questions do not contain the same limiting instructions.

"failed to inform the jury that their decisions must be based on the evidence before them"). And, to defendant's point, that instruction does not preclude the jury from considering defendant's allocution. Although, as defendant acknowledges, a defendant's allocution is not itself evidence, that does not mean that the allocution may not play an important role in determining the proper sentence. As noted, the principal value of the allocution in our current sentencing regime is its persuasive force. An allocution is not a means of adducing facts; it is a means of arguing, from the facts adduced, the sentence that a court or jury should impose. The fourth question seeks "the jury's exercise of a reasoned moral response" to the evidence presented, *Wagner*, 309 Or at 19, and a defendant's allocution may influence a jury's moral response to the evidence even if it is not itself evidence. In the same way that the arguments of counsel are not evidence but may be persuasive, so a defendant's allocution may turn the tide to the defendant's favor.

In this case, the trial court correctly instructed the jury that it could consider defendant's allocution when deciding the statutory questions on the verdict form and also correctly instructed the jury that its answer to the fourth question must be based on the evidence admitted during the trial. Those two instructions are not logically inconsistent, and the trial court did not necessarily negate the former by giving the latter.

### b.   Federal law

Defendant makes essentially the same arguments under federal law, contending that the instructions violated the Eighth Amendment to the United States Constitution, which requires that the jury have an adequate "vehicle for expressing its 'reasoned moral response' to *** mitigating evidence." *Abdul-Kabir v. Quarterman*, 550 US 233, 263, 127 S Ct 1654, 167 L Ed 2d 585 (2007) (quotation omitted).[13] As explained with respect to state law, by instructing the

---

[13] The Eighth Amendment to the United States Constitution states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The Fourteenth Amendment applies the Eighth Amendment to the states. *See Rogers,* 330 at 294 n 5 (citing *Robinson v. California,* 370 US 660, 667, 82 S Ct 1417, 8 L Ed 2d 758 (1962)).

jury that it was permitted to consider the allocution when deciding the statutory verdict questions, the instructions allowed the jury to consider the allocution while forming its reasoned moral response to the mitigating evidence admitted during the penalty-phase trial.[14]

### III.   CONCLUSION

For the reasons stated above, the circuit court's judgment sentencing defendant to death is affirmed.

The sentences of death are affirmed.

---

[14] Additionally, we have previously observed "that it is uncertain whether and to what extent the right of allocution may have a basis in the United States Constitution." *Ferman-Velasco*, 333 Or at 435; *see also Rogers III*, 330 Or at 303 (reviewing United States Supreme Court case law).